**AMERICAN HOME PRODUCTS CORPORATION, Plaintiff,**

v.

**JOHNSON AND JOHNSON and McNeil Laboratories, Inc., Defendants.**

No. 77 Civ. 1363.

United States District Court, S. D. New York.

Aug. 18, 1977.

Amended Opinion Aug. 29, 1977.

Darby & Darby, New York City, for plaintiff; Morris Relson, Michael J. Sweedler, S. Peter Ludwig, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant-counterclaimant; George S. Frazza, David F. Dobbins, Catherine R. Nathan, New York City, of counsel.

## OPINION

STEWART, District Judge.

Plaintiff American Home Products Corporation ("AHP") manufactures and distributes the brand-name drug Anacin through it marketing subsidiary Whitehall Laboratories. The defendant McNeil Laboratories, Inc. ("McNeil"), a subsidiary of defendant Johnson and Johnson, manufactures and distributes the brand-name drug Tylenol. Both Anacin and Tylenol are mild internal analgesics which are sold over-the-counter ("OTC") without a prescription. Anacin is a compound of aspirin ("ASA"), which gives it its analgesic property, and caffeine. Tylenol's analgesic ingredient is acetominophen ("APAP"). The two drugs are in direct competition and, while Anacin is still the largest selling aspirin-compound, not only is Tylenol the leading non-aspirin analgesic, but since July–August of 1976, its tablet sales have surpassed Anacin's.

This lawsuit concerns two Anacin advertisements. The first is a 30-second television commercial which was initially aired by AHP on November 29, 1976. A storyboard of this ad (hereafter "Your Body Knows" or "the commercial") which includes the full text and some of the accompanying visual presentation follows.

See following illustration.

# ADULT STRENGTH ANACIN

Client: Whitehall Laboratories
Agency: John F. Murray
Title: "Let Your Body Tell You"

Comm'l # AHAN 3271
Length: 30 sec
Date Produced:10/29/76

SPOKESMAN: Your body knows

the difference between these pain relievers...

and Adult Strength Anacin.

For pain other than headache Anacin reduces the inflammation that often comes with pain.

These do not.

(SFX: MUTED KETTLE DRUM) Specifically, inflammation of tooth extraction...

muscle strain...

(SFX BUILDS) backache...

(SFX BUILDS) or if your doctor diagnoses tendonitis...

neuritis

(SFX FADES) Anacin

reduces that inflammation...

(SFX OUT) as Anacin relieves pain

...fast. These do not.

Take Adult Strength Anacin

The advertising theme introduced by the "Your Body Knows" commercial was carried into the print media when the second advertisement in issue began appearing in national magazines in late January, 1977:

EXHIBIT 2

After the "Your Body Knows" commercial began running, McNeil wrote to all three television networks protesting the ad on the ground that it was deceptive and misleading because 1) its sole purpose was to persuade consumers that Anacin is a more effective analgesic when the medical evidence shows that ASA and APAP are equipotent, 2) it sought to convince consumers that Anacin is a superior analgesic for the conditions mentioned in the ad due to Anacin's ability to reduce inflammation, and this alleged property is unsupported by the medical evidence and 3) it invidiously sought to convey the message, for which there is no medical support, that Anacin works faster than Tylenol. (PX 14, 15 and 16.) McNeil also protested to the print media (PX 18) and filed a complaint with the National Advertising Division of the Better Business Bureau. (PX 13.) Despite these protests, CBS and NBC and the print media continued to carry the two ads in the form printed above. ABC, however, required AHP to change the statements "Anacin reduces that inflammation as Ana-

cin relieves pain fast. These do not." to "Anacin relieves both pain and its inflammation fast. These do nothing for inflammation."

As a consequence of the McNeil protests to the media, AHP commenced the instant action on March 21, 1977 seeking declaratory relief pursuant to 28 U.S.C. § 2201. AHP claimed that McNeil's complaints to the media concerning the TV commercial constituted charges that AHP had violated § 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a)[1] by making false and misleading advertising claims. AHP alleged that McNeil's charges had had, and would continue to have, an adverse effect on AHP's business and thus that there was a live controversy between the parties requiring adjudication. AHP requested the court to declare that the commercial violated no rights of McNeil and to enjoin McNeil from interfering with the broadcasting of the commercial or publishing of the analogous print ad. AHP also asserted a pendant claim of trade libel and unfair competition.

McNeil counterclaimed alleging that AHP violated the Lanham Act by publishing and airing advertisements and commercials which contain the false claims that Anacin 1) is a superior analgesic to Tylenol, 2) is an efficacious anti-inflammatory drug for the conditions listed in the ads and 3) provides faster analgesia than Tylenol. McNeil also claimed that AHP misbranded Anacin in violation of §§ 301 and 502(f) of the Food, Drug and Cosmetic Act, 21 U.S.C., §§ 331 and 352(f), because there are no labeling directions for Anacin's use as a therapeutic agent for the reduction of inflammation. In addition, it asserted a pendant claim of unfair competition. McNeil sought declaratory and injunctive relief

prohibiting AHP from continuing to make false claims for Anacin which falsely disparaged Tylenol.

On April 6, 1977, McNeil moved for a preliminary injunction prohibiting AHP from broadcasting the commercial and publishing the ad. After a hearing, we denied the motion on April 29, 1977 on the grounds that, although there were substantial questions going to the merits, McNeil had failed to make the requisite showing of irreparable harm and a balance of equities tipping decidedly in its favor. However, we granted the parties an expedited trial on the merits.

Section 1125(a) provides in pertinent part that

. . . any person who shall . . . use in connection with any goods . . any false description or representation, including words or symbols tending to falsely describe or represent the same, and shall cause such goods . . . to enter into commerce, and any person who shall with knowledge of the falsity of such . . . description or representation cause or procure the same to be transported or used in commerce . . shall be liable to a civil action by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Neither party challenges this court's jurisdiction, but we must independently determine the matter nevertheless. While most claims of false advertising asserted under 15 U.S.C. § 1125(a) have involved situations where the alleged harm arose from the misappropriation or misuse of a competitor's name or trademark or a distinctive feature of the competitor's prod-

1. 15 U.S.C. § 1125(a) provides:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or

representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

uct, false advertising which misleads the consumer concerning a quality or attribute of a product "in commerce" and falsely disparages a competitor's product states a claim under the Act as well. *American Brands, Inc. v. R. J. Reynolds Tobacco Co.,* 413 F.Supp. 1352 (S.D.N.Y.1976). McNeil has alleged that AHP's false representations are deceiving consumers and damaging Tylenol's reputation and thus has standing to charge AHP with violating 15 U.S.C. § 1125. *Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777 (N.D.Ill.1974). McNeil does not, however, have standing to charge AHP with violating the branding provisions of the Food, Drug and Cosmetic Act. *See* 21 U.S.C. § 337; *Florida ex rel. Broward County v. Eli Lilly & Co.,* 329 F.Supp. 364 (S.D.Fla.1971). Accordingly, we have jurisdiction pursuant to 28 U.S.C. § 1338 over the complaint and all counterclaims except that alleging violations of 21 U.S.C. §§ 331 and 352(f).

The statute prohibits the use of
. . . any false description or representation, including words or other symbols tending falsely to describe or represent the same . . ..

Although the parties' positions have shifted somewhat over the course of the litigation, it appears that some disagreement remains as to exactly what representations have been made in the ads concerning Anacin.

McNeil alleged that four statements in the ad were false:

1) *TV VERSION:* "Your body knows the difference between these pain relievers [Tylenol and Datril] and Adult Strength Anacin."

*Print version:* "With these pains [referring to the enumerated conditions], your body knows the difference between the pain relievers in Adult-Strength Anacin and other pain relievers like Tylenol."

McNeil claimed that these statements conveyed the false message that Anacin is a superior analgesic. AHP contended that any analgesic superiority claim was limited to inflammatory conditions.

2) *TV version:* "For pain other than headache, Anacin reduces the inflammation that comes with pain. These [Tylenol and Datril] do not. Specifically, inflammation of tooth extraction, muscle strain, backache, or if your doctor diagnoses, tendonitis, neuritis."

*Print version:* "Anacin can reduce inflammation that comes with most pain . . . Anacin can reduce the inflammation that often comes with these pains [referring to 'sinusitis, tooth extraction, muscular backache, muscle strain, sprains' and 'doctor diagnosed tendonitis and neuritis']. Tylenol cannot."

McNeil contended that these statements conveyed the general false message that Anacin is a more effective or superior analgesic than Tylenol. McNeil also asserted that these statements falsely claimed that Anacin is effective drug therapy for the reduction of inflammation that is associated with the listed conditions and thus conveyed the false message that Anacin will cure the inflammation.

AHP contended that these statements made no claim that Anacin is effective drug therapy for the treatment and cure of inflammation associated with the conditions listed. It contended that the message is that as a pain reliever, Anacin has an anti-inflammatory effect which Tylenol lacks and thus is a more effective analgesic for inflammatory conditions.

3) *TV (CBS and NBC) version only:* "Anacin reduces that inflammation as Anacin relieves pain fast. These [Tylenol and Datril] do not."

McNeil alleged that these statements imply that Anacin gives faster relief than Tylenol and thus that the consumer receives the false message that Anacin is faster.

AHP contended that the statements do not make any claim of competitive superiority with respect to speed of relief and that the consumer does not receive a message of "faster relief" from the commercial.

4) *Print version only:* "Millions take Anacin with no upset stomach."

Although McNeil did not specifically refer to this sentence in its counterclaims, it argued later that not only is this statement literally false, but it also falsely implies to consumers that Anacin will not cause *any* stomach upset.

AHP contended that this statement conveyed the truthful message that millions of people use ASA without stomach upset although others may suffer from this side effect.

■ While the Federal Trade Commission ("FTC") may rely on its own expertise in interpreting the language of an advertisement in order to discover what message has been conveyed for purposes of determining whether or not an ad was false and thus an unfair or deceptive practice in violation of 15 U.S.C. §§ 45 and 52, *Warner-Lambert Co.,* 1976–77 Trade Reg.Rep. ¶ 21,-066 at 20,926 (December 9, 1975), *aff'd as modified, Warner-Lambert Co. v. Federal Trade Commission,* 562 F.2d 749 (D.C.Cir. 1977); *Resort Car Rental System, Inc. v. Federal Trade Commission,* 518 F.2d 962 (9th Cir.), *cert. denied, MacKenzie v. U. S.,* 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), it is the reaction of the consumer that is critical when determining whether an ad made false representations or used words tending to falsely represent the product in violation of 15 U.S.C. § 1125(a). 1 Callman, Unfair Competition, Trademarks and Monopolies, § 19.2(a)(1) (3d Ed. 1967). As Judge Lasker indicated in *American Brands, supra,*

> A court may, of course, construe and parse the language of the advertisement. It may have personal reactions as to the defensibility or indefensibility of the deliberately manipulated words. It may conclude that the language is far from candid and would never pass muster under tests otherwise applied—for example, the Securities Acts' injunction that "thou shalt disclose"; but the court's reaction is at best not determinative and at worst irrelevant. The question in such cases is—what does the person to whom the advertisement is addressed find to be the message? 413 F.Supp. at 1357.

Both parties have presented evidence of consumer reactions to the ad consisting of opinion research conducted by organizations which both parties recognize as the major advertisement testing organizations in the country. In addition, each side presented expert witness testimony concerning the interpretation of the ads.

■ Both Mr. Albert Shepard and Dr. Donald Payne, the expert witnesses who testified as to the meaning of the ad and commercial, are concededly highly qualified in the field of market research, especially with respect to advertising. And under some circumstances, we would be inclined to afford their opinions as to the message of the advertising substantial weight. We have not done so here for a number of reasons.

First, and most importantly, we have actual tests of consumer reactions which are recognized as the best evidence of what meaning consumers take from advertising. And second, we did not find the testimony of either expert particularly enlightening or helpful to understanding the test data. Mr. Shepard's testimony was based largely on his personal review of the ad and commercial in question plus an additional promotional flyer and another, different Anacin commercial. Some of the material he considered is not involved in this action and although he referred to some of the test data to support his opinions, he was not able to accommodate the data which did not support his position in a satisfactory way. Dr. Payne's testimony rebutting Mr. Shepard's was more closely tied to the data, but we found illogical and ill-considered his suggestion that in evaluating the data the proper interviewee base to use was all those who had been surveyed, and not just those who claimed or were proven to have recalled the advertisement. In short, we found neither expert's opinions to be very reliable and have concluded that they are significant only to the extent that they corroborate, or were corroborated by, the test data itself. Since this data was presented in full at trial and was self-explanatory to a great extent, we think it

preferable to consider the data directly and not through the testimony of either expert.

The consumer testing was conducted in two different ways. Gallup & Robinson, Inc. ("G&R") conducts telephone interviews the day after the commercial is aired with individuals who claim to have watched the television program during which the ad appeared. ASI Market Research, Inc. ("ASI") conducts special screenings of television programs and commercials for many different kinds of products. The audience is specially selected so as to include a range of ages, income levels, and occupations. The audience is questioned about their reactions to the programming both during and after the screening.

The ASI date [2] was based on one screening for 250 people of whom 81% recalled the advertiser's name, 5% recalled the product category and 14% recalled neither brand nor category, or recalled the brand incorrectly. 64% were able to report one sales point from the ad and 42% of these reported two sales points. 36% could recall no sales point at all.

Of the 64% who recalled at least one sales point, their responses to the question "What was the advertiser trying to tell you about his product?" broke down as follows: 46% of the audience mentioned "symptom relief," 31% mentioned some kind of "competitive superiority" and 6% made some reference to "speed of relief." (PX 20A at 4–5.) While the verbatim responses are not included in the ASI report, it appears that most of the 46% of consumers who mentioned symptom relief referred generally to "pain" or "headache" and only a few referred specifically to the conditions listed in the ad. Similarly, it appears that the message of competitive superiority reported by 31% of the viewers was a general message of superiority—better, more effective, stronger—and was not limited only or primarily to superiority for inflammatory conditions. Finally, of the 6% who reported a message concerning speed of relief, 4% re-

called simply a claim of "fast" relief and only 1% recalled the comparative claim of "faster."

G&R interviewed a total of 61 television viewers who claimed to have seen and remembered the commercial on February 2, March 20, and April 8, 1977. (CCX 102, 105, 106 and 107.) They combined the data from the three dates and reported the following breakdown of consumer responses to questions concerning what sales points made in the commercial the interviewees remembered. 75% reported that the commercial compared the product to other brands, although only 30% thought the comparison was with Tylenol. 61% reported the message that the product gave relief. 49% mentioned "fast acting" as a sales point and, finally, 39% referred to the quality of the product as "better/best", 28% mentioned "strong/stronger" and 20% that the product was "effective."

We found the statistical presentation a little unclear and unhelpful. For example, G&R lumped together responses mentioning that Anacin gives relief from pain and inflammation when it is important for our purposes to know how many people got an inflammation message and how many got a more general pain relief message. Also, there was no breakdown in the responses relating to the qualities or attributes of the product (strength, effectiveness, speed of action) to reveal how many actually expressed comparative superiority.

But we did have the verbatim interviews for the G&R reports and we have studied them carefully. These revealed that the symptom relief reported was general pain relief with relatively few references to the specific conditions listed in the ad or to the reduction of inflammation. They also revealed that more of the comments on speed of relief were comparative (faster/quicker), as were those on the product's quality (better, more effective, stronger).

However, we also discovered from reading all the verbatims that although the

2. The ASI data was introduced in PX 20/CCX 74 and PX 20A. PX 20 and 20A list different test dates, but it appears that this was an error

and that PX 20 and PX 20A are reports of the results from the same screening.

interviewees claimed to be recalling the specific Anacin commercial aired the night before,[3] it seemed that many were reporting what they thought would or should have been in the ad. This appeared from such things as the factually inaccurate descriptions given of the situation depicted in the ad, the speculative words used in the answers, and comments indicating that the interviewee paid little or no attention to the ad either for lack of interest in commercials generally or Anacin specifically or because he or she knew what the ad was going to say already.

Initially we were disposed to think that the G&R method of testing would be better, because the consumer saw the commercial in the normal context—viewing TV at home. However, the verbatims caused us to seriously doubt the reliability of this method, at least when the need was to find out how the consumer interpreted the advertisement's language, i. e., what the consumer took the message to be from the particular language used. The G&R technique very interestingly, and probably accurately, revealed how much viewers attend to and interact with TV commercials and how an ad for a familiar product seemed to leave its impact by triggering the viewer's past association with the product as well as by hooking the viewer's interest in the particular new advertising copy being aired. But we are not confident that the G&R technique really tested what message the consumer took from the language used as opposed to the broader issue of what mental processes viewers went through when they noticed an Anacin ad appear on the screen.

Unfortunately we did not have verbatims from the ASI screening so that we could evaluate it as we have the G&R tests.[4] However, we think that the format of the ASI presentation was likely to cause the audience to attend to the programs and ads more closely and thus more accurately reflect what the average consumer who heard and saw the ad took the message(s) to be, although it probably less accurately reflects the real impact that seeing an Anacin ad will have on the viewer.

With this comparison of the reliability of the tests for our purposes in mind, we will consider the conclusions of the ASI and G&R tests. It appears from both studies that the principal message was that Anacin provided symptom relief. This relief appeared to be for pain generally and not, by and large, for only particular kinds of pain such as in those conditions listed in the ad. Specifically, the statement concerning reduction of inflammation was not played back as substantially modifying the message as to the kind of pain relief Anacin could give.

Next, the studies both supported the claim that competitive superiority was a message taken by the consumer. There was no evidence that the superiority claim was limited to pain associated with inflammation as AHP claimed and thus we think the preponderance of the evidence supports the claim that the commercial made the broad representation that Anacin gives superior pain relief.

The tests made it equally clear that the consumer did not think that the ad was making a claim that Anacin cures inflammation. The tests reported divergent findings, however, on the issue of whether the language of the ad conveyed a claim of "faster" relief. ASI shows 1% of the viewers reporting this message; G&R show 49% reporting "fast acting" and our analysis of the verbatims reveals that most of these, totalling about a third of the entire test audience, reported the "faster" message. We think that the ambiguous language used, "Anacin reduces inflammation as it relieves pain fast. These do not." strongly suggests a comparative claim of faster.

3. G&R represent that these are people with proven recall of the ad, not simply claimed recall. (CCX 102 A.)

4. There were a few accuracy or reliability controls in the figures for incorrect recall of advertiser's name, failure to recall either brand product or any sales point. We think the Burke Marketing Research, Inc. procedure of separating proven, possible and unrelated recall and including verbatims is much more helpful. (See PX 52.)

And we note that the Advisory Review Panel on OTC Internal Analgesic and Antirheumatic Products ("IAP")[5] found that "terms such as 'fast pain relief' " were unacceptable performance claims because "confusing and misleading to the consumer" unless they could be substantiated and clearly supported by scientific data. 21 CFR 343, Federal Register, Vol. 42, Book 2, (hereafter "IAP Report") at 35373.

 If we had the situation in which the G&R data reporting some 33% of consumers getting a message of "faster" relief were coupled with other test data showing the same trend, although less strongly, we think that the evidence would be sufficient for us to find a message of "faster." Section 1125 prohibits not only false representations, but the use of words which tend to falsely represent a product. Clear evidence of a trend in consumers to take a "faster" message would satisfy the second part of the statute.

However here, the G&R data was in marked contrast to the ASI data, which we think is more reliable, showing only 1% of the viewers reporting the faster message. Mr. Shepard testified that if only 1% reported faster he would have to reassess his conclusions as to the major messages received from the ad. (Tr. 241.)[6] He did not come to grips with the ASI data and thus did not reassess his conclusions. The ASI statistic so strongly undercut and really contradicted the G&R data that we must conclude that McNeil has not shown by a preponderance of the evidence that the commercial made, or tended to make, a representation of "faster relief."

Turning to the print version of the ad, we have one study of consumer reaction done

by G&R. (CCX 108.) This test was done by interviewing forty-three women who had read a particular issue of The Ladies' Home Journal in which the Anacin ad appeared. Of the forty-three interviewed, only seven recalled the ad. However, the remaining thirty-four, after they answered the regular questions, were then asked to turn to the Anacin ad in the magazine, look at it, then close the magazine and tell the interviewer what they remembered about the ad and what it said. This "forced exposure" testing technique seemed close to the IV commercial procedure used by ASI.

After studying the verbatims, we have found that about 75% of the consumers reported a competitive superiority message relating to pain relief performance. About 50% reported the message that Anacin reduced inflammation, and about 25% reported the message that Anacin was better specifically for the conditions listed of which usually two or three would be mentioned by name. Combining the figures for those who reported the reduction of inflammation and superior analgesic for the particular conditions listed in the ad (and not including multiple responses) we find that about 75% reported the message that Anacin was better for relieving pain for some conditions because it could reduce inflammation.

Thus we find that the preponderance of the evidence of consumer reaction demonstrates that the competitive superiority message conveyed in the print ad was a qualified one, that Anacin is better for relieving pain for some conditions because it reduces inflammation.

Of the forty-three women questioned, three reported the message that Anacin

---

5. The Panel was made up of qualified experts appointed by the Commissioner of Food and Drugs to evaluate the safety and efficacy of OTC analgesic, antipyretic and antirheumatic drugs, to review OTC drug labeling and advise the Commissioner on the promulgation of monographs establishing conditions under which these OTC drugs are generally recognized as safe and effective and not misbranded. 21 CFR § 330.10. The Panel's monograph and the Commissioner's proposed regulation concern-

ing the conditions under which these drugs are safe, effective and not misbranded was published in the Federal Register on July 8, 1977. After receiving comments, the Commissioner will publish a final order establishing these conditions.

6. "Tr." will be used to refer to the trial transcript; "PI" refers to the transcript of the hearing on McNeil's motion for preliminary injunction.

was "gentle to the tummy" or "didn't upset the stomach." This was the general message which McNeil contended was conveyed by the sentence "millions take Anacin with no stomach upset." We think that three responses are too few for us to be able to conclude that the preponderance of the evidence demonstrates that this representation is being made or tends to be made. In this regard we note that of the sixty-one TV viewers surveyed by G&R, three also reported the message "doesn't upset the stomach" and there was no reference to stomach upset in the TV commercial at all. Thus we find that the evidence did not show that the print ad makes a representation that Anacin can be taken without any stomach upset.

In sum, we find that the evidence of consumer reaction showed that the message which the consumers took from the first statements which McNeil claimed to be false in the TV commercial was that Anacin is a superior analgesic generally, and not only with reference to particular conditions such as those enumerated in the ad or to Anacin's alleged ability to reduce inflammation. However, the evidence of consumer reaction showed that the message from the print ad was a more limited superiority claim, that Anacin is a superior analgesic for certain kinds of pain because Anacin can reduce inflammation. There was no disagreement that the commercial and ad both represent that Anacin can reduce inflammation associated with the conditions listed which was McNeil's second claimed falsity.

■ We find that the evidence is not sufficient to sustain McNeil's claim that the language of the CBS and NBC version of the commercial conveyed the message that Anacin works faster or its fourth claim that the print ad conveyed the message that Anacin can be taken without any stomach upset. While it appeared at trial that McNeil was contending that the literal language "millions take Anacin with no stomach upset" was false, i. e., that everyone who takes aspirin, and therefore Anacin, suffers stomach upset (see PI 425), their final position was that the statement is literally true.

We can now consider the question as to whether these messages 1) Anacin is a superior analgesic, 2) Anacin is a superior analgesic for certain conditions because it reduces inflammation, and 3) Anacin reduces inflammation for the conditions listed in the advertisement, are "false representations" or tend to falsely represent Anacin.

McNeil contended that the burden was on AHP to substantiate its claims by reliable scientific evidence. It suggested that AHP had to prove the truthfulness of its claim either by a preponderance of the evidence, the normal burden in a civil action, and the standard required of the FTC in actions brought by the commission under 15 U.S.C. §§ 45 and 52, or by "substantial evidence," the standard set by the Food and Drug Administration ("FDA") for approving new drug applications. Although it would appear that the FDA standard is lower, the FDA has defined "substantial evidence" very strictly as

evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and reasonably be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. 21 U.S.C. § 355(d).

Under its regulations, the FDA has further indicated that in order to be an "adequate and well-controlled clinical investigation," the study must include:

1) A clear statement of the objectives of the study;

2) A method of subject selection which minimizes bias, assures suitability, and assures that the subjects are comparable;

3) An explanation of observation and recording methods, including steps taken to minimize bias on the part of the subject or observer;

4) A comparison of results with a control, in such a way as to permit quantitative evaluation; and

5) A summary of methods of analysis and data. 21 CFR § 314.111(a)(5)(ii)(a).

By contrast, the FTC has stated that the exact nature of the evidence that will constitute a reasonable basis for a product claim

is essentially a factual issue which will be affected by the interplay of overlapping considerations such as (1) the type and specificity of the claim made—e. g., safety, efficacy, dietary, health, medical; (2) the type of produce—e. g., food, drug, potentially hazardous consumer product, other consumer product; (3) the possible consequences of a false claim—e. g., personal injury, property damage; (4) the degree of reliance by consumers on the claims; (5) the type, and accessibility, of evidence adequate to form a reasonable basis for making the particular claims. More specifically, there may be some types of claims for some types of products for which the only reasonable basis, in fairness and in the expectations of consumers, would be a valid scientific or medical basis. The precise formulation of the "reasonable basis" standard, however, is an issue to be determined at this time on a case-by-case basis. *Pfizer, Inc.*, 1970–73 Trade Reg. Rep. ¶ 20,056 at 22,-029, 22,034 (July 11, 1972).

■ McNeil has asserted that the FTC "expressly adopted and applied [the FDA standard and regulations] as the minimal criteria for substantiation of advertising claims" in *Warner-Lambert.* (McNeil Post Trial Brief at 4.) We find no such indication in that case. Although the Commission stated that even the "substantial evidence" standard had not been met there, it reaffirmed its "preponderance of the evidence test" and its position that, although it would take into account determinations by the FDA, it would not "automatically defer" to that agency. *Warner-Lambert* at 20,932 n. 18.[7] While determinations of nei-

ther the FDA or FTC are controlling in the instant case, we think that a private action for false advertising under the Lanham Act is more analogous to an FTC proceeding under 15 U.S.C. §§ 45 and 52 than an FDA proceeding for approving a new drug. Accordingly, the FDA's standard of proof and definition of what evidence it will consider probative is not applicable here.

■ However, we do not agree that the sole burden is on AHP. In order for McNeil to prevail on its counterclaims and obtain the injunctive relief it seeks, McNeil has the burden of proving that AHP violated § 1125 by a preponderance of the evidence just as AHP has the burden of proving that it did not violate the statute in order to obtain the injunctive relief it seeks, as well as any damages.

■ Before considering the medical and scientific evidence on the claims, we think it appropriate to comment briefly on what we see the role of this court to be. What is before us is a private cause of action between two competitors in which the advertising claims of one, AHP, have been challenged on the grounds that they contain false representations about Anacin and that they unfairly disparage Tylenol. While we are mindful that the products involved are drugs and that the advertising is aimed at the general consuming public, not informed professionals, an action under the Lanham Act and state unfair competition laws is not the proper legal vehicle in which to vindicate the public's interest in health and safety. *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 691–3 (2d Cir. 1971); *California Apparel Creators v. Wieder*, 162 F.2d 893 (2d Cir. 1947). These concerns have been primarily entrusted to the care and guardianship of the FTC which is empowered to bring actions to enjoin deceptive and unfair trade practices under 15 U.S.C. §§ 45 and 52, and the FDA which is empowered initially to pass on the safety and efficacy of all new drugs and to promulgate regulations concerning the con-

7. In upholding the Commission, in *Warner-Lambert v. FTC, supra*, the Court of Appeals for the District of Columbia accepted the Commission's conclusions on this issue.

ditions under which various categories of OTC drugs, including analgesics and anti-rheumatic products are safe, effective and not misbranded. 21 CFR 330.1, 330.5 and 330.10.

Thus we do not think that it is within the province of this court to go beyond the issue of the falsity of the advertisement's representations and consider whether the public interest is well served by allowing such representations to be made. In addition to arguing that ASA will cause many serious side effects, McNeil has sought to impress on this court the dangers to the public of the Anacin ad on the grounds that it encourages consumers to self-diagnose their ailments and self-prescribe the drug with which to treat their condition. We agree that these are undesirable practices and we note that it was to discourage them that the "IAP" has recommended that the labeling of internal analgesics be limited to general claims of pain relief and not enumerate the conditions for which they may be used. IAP Report at 35354–35355.

However, even if the IAP's recommendations are adopted by the FDA, that agency does not have authority over advertising claims. Thus the IAP recognized that all it could do was request that the agency responsible for regulating advertising, the FTC,

> . . . more effectively regulate commercial advertising of internal analgesic, antipyretic and antirheumatic preparations on the basis of the labeling recommendations contained in [the IAP Report]. Further, the Panel strongly urges the Federal Trade Commission to require that the cautionary language and warnings developed by the Panel be given emphasis in commercial advertising more so than is currently being done. . . . IAP Report at 35356.

We think the record here supports the view that FTC regulation of OTC drug advertising in conformity with the IAP's labeling recommendations would have a salutary effect, but we do not think these considerations should enter into our determination of this action.

Before considering the first two claims (p. 796 *supra*) concerning Anacin's efficacy as an analgesic, we will evaluate the claim that Anacin reduces the inflammation that often comes with pain—specifically the inflammation accompanying the conditions listed in the advertisements—because this is the general medical premise upon which the possibility of superior analgesia rests.

The parties, the experts, general medical opinion and the medical studies are in substantial agreement concerning several aspects of ASA's anti-inflammatory properties. It is generally recognized in the medical community that ASA has anti-inflammatory properties,[8] and there is complete agreement that ASA has an anti-inflammatory effect specifically in the treatment of rheumatoid arthritis ("RA"). Indeed, ASA therapy is the standard treatment for persons suffering from RA, although the dosage required usually exceeds that recommended for OTC use. It is also generally accepted that ASA has an anti-inflammatory and analgesic effect in the treatment of arthritis and other rheumatic diseases. ASA's efficacy as an agent for the reduction of inflammation and joint or muscle tenderness or swelling in inflammatory and rheumatic conditions has recently been approved by the IAP, although the Panel concluded that ASA and the other OTC drugs which have this property (APAP was not included in this category), should not contain OTC labeling for treating inflammatory or rheumatic conditions. (IAP Report at 35352.) One factor which caused the Panel to recommend against OTC labeling was their conclusion that the dosage required might often exceed that recommended for OTC use.

---

**8.** Dr. Bennett Derby testifying for McNeil agreed that in the past ASA was traditionally thought to have an anti-inflammatory effect, but he stated that prevailing medical opinion had changed because of lack of evidence one way or the other about this property. (Tr. 97.) We have found no support for Dr. Derby's conclusion that the prevailing opinion has changed.

The parties disagreed, however, as to whether ASA at OTC dosages has a clinically significant [9] anti-inflammatory effect for the various conditions listed in the advertising.

In support of this claim AHP presented evidence consisting of the currently accepted medical theory concerning the mechanisms of action by which inflammation occurs in animals and humans and by which ASA reduces inflammation, clinical studies done with RA patients, and clinical practice in the medical profession.

The currently accepted medical theory concerning the processes by which inflammation occurs in animals and humans and by which ASA acts as an anti-inflammatory agent have been described in the medical literature and were testified to in some detail by Dr. Gerald Weissmann on behalf of AHP. (CCX 49, PX 62–70 and 73.) As Dr. Weissmann explained, when a cell is injured by trauma, or other stimulus, various substances are released by the cell and transformed by enzymes into what are referred to as "mediators of inflammation" because they provoke some or all of the cardinal signs of inflammation—heat, swelling, redness, pain and loss of function. Experiments have identified many such mediators of inflammation, one group of which has been named the "prostaglandin" ("PG") group. Some PG's are very inflammatory and others are not. Experiments have revealed that ASA and other non-steroidal anti-inflammatory drugs inhibit the production of prostaglandin synthetase ("PGS"), the enzyme which effects the transformation of the substance initially released by the injured cell into one of the PG group mediators of inflammation. It is this action of ASA—inhibition of the production of the enzyme PGS—which is considered to be the mechanism by which ASA achieves its anti-inflammatory effect. However, Dr. Weissmann pointed out that the PG group are only some of the mediators of inflammation and since ASA and the other non-steriodal

anti-inflammatory drugs only inhibit the enzyme which produces the PG mediators, these drugs will reduce inflammation, but not abolish it, since they do not inhibit the production of other mediators of inflammation. (Tr. 497–506.)

McNeil accepted that this might be a sound theory, but contended that one could not extrapolate from it to a claim of clinically significant anti-inflammatory efficacy for ASA at OTC dosages in the conditions listed in the ad. However, AHP asserted that studies of the anti-inflammatory efficacy of OTC dosages of ASA in patients with RA, as well as clinical observation, supported its position.

The RA studies upon which AHP relies are PX 24, PX 74, PX 75, PX 76 and PX 77. In two of these studies, the daily doses of ASA were within the OTC range, and the duration of treatment was within the ten-day period recommended for OTC drugs. (PX 24 and PX 75.) In these two, the results suggested that low or intermediate doses of ASA had some therapeutic efficacy in reducing inflammation. In the other three, OTC doses were given, but the duration of treatment was much longer than ten days. PX 74 and 76 reported some anti-inflammatory action from low doses of ASA given over six and four-week periods. PX 77 reported no statistically significant improvement using intermediate doses of ASA for four weeks compared to the baseline period when no anti-inflammatory drug was administered.

In addition to these studies, CCX 146 and 147 also tested high and low (OTC) dosages of ASA, CCX 146 for seven days' usage, CCX 147 for eight weeks' usage. Both these studies showed statistically significant reduction of inflammation with the high dose of ASA, but no such effect with the low dose.

We think that weight may be given to tests on RA when considering more general anti-inflammatory claims because of the difficulties in testing conditions of much

9. A claim concerning a drug's effect made in lay advertising to consumers must be understood as representing that the effect will be experienced in humans and thus that it has some significance in a clinical context.

shorter duration. (Dr. Thomas DeKornfeld PI 349–350; Dr. Weissmann Tr. 710–11, 730; Dr. George B. Koelle 1194–95.) Although we understand that inflammation caused by different stimuli may involve different mediators, there appear to be sufficient characteristics in common to make research on one inflammatory condition probative of other conditions associated with inflammation. (Dr. Weissmann Tr. 490–96, 529–32, 557–8, 727–8, 730; Dr. Koelle Tr. 1194–95; Dr. Michael M. Gilbert Tr. 1019.)

However, we are also aware of the difficulty of distinguishing the anti-inflammatory effect of a drug from its analgesic effect. This appears to be due in part to the fact that the mechanisms of action are related, in that it is believed that PG not only mediates the signs of inflammation, but also sensitizes the pain receptors. (Tr. 674; CCX 49.) There are also practical problems of developing methods to quantify the signs of inflammation and pain and of distinguishing between these two effects in a test situation. (PX 24; Dr. DeKornfeld PI 349–52; Dr. Derby PI 212; Dr. Weissmann Tr. 494–5, 710–11; Dr. Koelle Tr. 1194–95.)

Considering all these factors, we think that the clinical test evidence suggests that ASA may have some anti-inflammatory effect in OTC dosages for conditions associated with inflammation other than RA, but goes no further than this.

The advertising is not limited, however, to a general claim concerning ASA's efficacy in reducing inflammation, but lists specific conditions in which it is asserted that Anacin does reduce inflammation.

The expert witnesses were not in agreement as to what diseases were meant by the terms used with the exception of "tooth extraction." They also disagreed as to the nature of the diseases which they understood the ad to encompass, particularly as to whether or not the disease was associated with inflammation. And they disagreed concerning whether ASA is, or should properly be, used for these diseases, and whether ASA, if used, would have a clinically significant anti-inflammatory effect on the disease at OTC dosages.

While Dr. Derby contended that several of the conditions listed would not have inflammation associated with them (PI 36, 41, 48, 248), the evidence from the medical literature and the testimony of the other expert witnesses established that at least some forms of all the diseases listed have inflammatory components. (PX · 79, PX 91A, PX 91B, PX 101, PX 104, PX 110 and CCX 52, CCX 123, CCX 124; Tr. 536–39, 554, 556, 608, 625–26, 705–06, 745–47, 749–50, 1403–06, 1424–25, 1428–29, 1433.)

Reports from the medical literature which considered ASA therapy were introduced on only two of the conditions listed: tooth extraction and tendonitis. The literature on tendonitis consisted of two rather informal pieces concerning "tennis elbow" which identified it as an inflammatory condition and suggested that ASA might help to relieve the inflammation and pain. (PX 79 and 104.) In addition, there was a brief piece which indicated that moderate doses of ASA might be sufficient for treating mild inflammation in bursitis and calcific tendonitis. (CCX 52.)

The literature on forms of treatment after oral surgery, specifically tooth extraction, was more extensive and included several relatively well-conducted studies on the efficacy of ASA and other drugs, including APAP, as analgesics. (PX 32, CCX 29A, CCX 56, CCX 57, and CCX 136B.) The studies showed that ASA was an effective analgesic, although APAP was shown to be equally effective. Several of the studies speculated that ASA's analgesia was in part due to its anti-inflammatory properties, but several also reported increased bleeding with ASA, due to its anti-coagulant property. In one, CCX 136B, APAP and codeine were reported to give significantly better analgesia than ASA alone, and significantly less swelling was observed with the combination than with ASA. The researcher suggested that the greater swelling, despite ASA's anti-inflammatory property, might be due to ASA's effect of increasing bleeding.

On all the other conditions, we have only the testimony of mainly Drs. Weissmann and Sheldon Blau and some general comments in medical texts concerning the use of ASA and its possible anti-inflammatory effect. On the other hand, we have Dr. Derby's carefully considered testimony, evidence from some other texts and concessions by some of AHP's witnesses that ASA is not recommended therapy for some forms of the conditions listed.

In light of the confusion that the terms have caused among trained medical persons, the fact that an anti-inflammatory response is very hard to distinguish from an analgesic one, and the inherent unreliability of clinical observation (Tr. 561), we have concluded that clinical observation of efficacy is unacceptable as evidence to support the claims made for the conditions listed except as corroboration of results obtained from well-conducted studies.

While Dr. Weissmann may be correct that clinical studies for each and every condition listed might not be necessary to support the claims made (Tr. 730), we have concluded that some substantial clinical testing of the conditions is required. The clinical materials on tendonitis, discussed above, are not studies or tests at all. The actual tests with tooth extraction did not focus on the anti-inflammatory, as opposed to the analgesic, effect of ASA clearly enough to enable us to draw any conclusions concerning ASA's anti-inflammatory properties from them. Thus the clinical reports and tests do not lend any certainty or greater reliability to the very tentative extrapolation which we think may be made from the RA tests and the informed speculations and clinical observations expressed by AHP's witnesses.

Accordingly, we find that there is no reliable evidence showing that ASA reduces inflammation to a clinically significant extent in the conditions listed in the advertisements at OTC dosages. On the other hand, we think that McNeil has not proved by a preponderance of the evidence that this claim is, or tends to be, false. It appears that the state of medical and scientific knowledge is not such as to allow anyone to make a definitive conclusion either way on this issue. Were this, then, the only representation made in the ad, we would have to grapple with the question of whether a competitor could succeed on a Lanham Act claim by showing that there was no reliable evidence to support the representation, even though the competitor could not itself affirmatively prove that the claim was false or tended to misrepresent the product. However, two other claims concerning Anacin's relative efficacy as an analgesic, which are integral to and inseparable from this representation, are susceptible of more definitive proof.

We have found that the first allegedly false representation, that Anacin is a superior analgesic, reached the television viewer without qualifications limiting the claimed superior efficacy to conditions accompanied by inflammation. While the actual comparison made in the TV commercial was between Anacin and Tylenol and Datril, many viewers thought the comparison was between Anacin and other aspirin products. A claim of superior analgesia for Anacin compared to ASA would be nonsensical since the only analgesic ingredient in Anacin is ASA. We will consider, therefore, what evidence there is of the relative analgesic efficacy of ASA and APAP.

While AHP has not actually conceded that ASA and APAP are generally considered to be equally effective pain relievers, it has pressed its argument for ASA as a superior analgesic only in conditions in which inflammation is present. We find that the overwhelming weight of the evidence—from medical studies and the clinical experience and impressions of both AHP's and McNeil's experts—indicates that ASA and APAP are equally effective as general, mild, internal analgesic.

In all but one of a number of controlled double-blind clinical studies comparing the analgesic effectiveness of ASA and APAP, the data revealed no statistically significant differences between the two drugs, al-

though in several cases ASA scored better than APAP.[10]

That ASA and APAP are roughly equivalent and effective as analgesics is generally recognized in the medical community. (See studies cited in footnote 10 and PX 89, PX 108, PX 30, PX 63 at 344, IAP Report at 35412–3.) And the expert witnesses presented by both AHP and McNeil agreed that simply as analgesics, the two drugs were equally effective. (Dr. Gilbert Tr. 967–8;[11] Dr. DeKornfeld PI 363; Dr. Behrman Tr. 273, 275; Dr. Weissmann Tr. 580; Dr. Koelle Tr. 1222, 1236.)

Thus we find that the overwhelming weight of the evidence indicates that ASA and APAP are equally effective as general mild, internal analgesics.

The second allegedly false representation is a modified claim of analgesic superiority—that ASA is a superior analgesic for conditions which are associated with inflammation or have an inflammatory component. We have evaluated the medical studies cited in footnote 10, with respect to this modified superiority claim and find that they offer no real support for it either. Two of the studies were of the analgesic effects of ASA and APAP in RA patients. In the more recent study, PX 88, although ASA scored better, there was no statistical difference between its analgesic efficacy and APAP's. PX 93 reported a significant difference in ASA over APAP, but we found this not as methodologically sound as PX 88 and some of the other tests reported. Thus, the strongest conclusion that we are willing to draw from these two studies is that they suggest that ASA may be a more effective analgesic in a condition (there RA) with an inflammatory component.

Weighing against this "suggestion" is the fact that in many of the other studies in which no statistically different analgesic effect between ASA and APAP was reported, the conditions involved were accompanied by inflammation. These include post partum pain (CCX 25), post-operative pain (CCX 27), tonsillectomy (CCX 29), and oral surgery (CCX 29A). Thus, we think that the weight of the medical studies indicates that ASA and APAP are equally effective analgesics in conditions associated with inflammation.

However, there was considerable evidence of the opinion in the medical community that ASA is, or may be, a more useful or effective analgesic than APAP in conditions with inflammatory components. (IAP Report at 35413; PX 30, PX 63, PX 89, PX 92, PX 97, PX 108.)

The expert witnesses presented by AHP also testified that ASA is a more effective analgesic than APAP for conditions accompanied by inflammation. Dr. Weissmann, whom we found to be a knowledgeable, careful and credible witness, testified that on the basis of ASA's anti-inflammatory properties, in conditions where "substantial inflammation" was present, the pain relief provided by ASA "would be greater" than that provided by APAP. (Tr. 726.)

Dr. Koelle, whom we also found to be a knowledgeable and credible witness, although recognizing that "according to most all of the double-blind clinical pharmacological trials in patients, at a given moment both APAP and ASA have the same amount of analgesic potency," testified that

if a patient is treated for a week, say, following a sprained ankle, he should have relief of the pain several days sooner by an anti-inflammatory agent that is

---

10. See CCX 23, CCX 24, CCX 25, CCX 27, CCX 28, CCX 29, CCX 29A and PX 88. The only study which reported ASA as a significantly superior analgesic was PX 93, a study of analgesia in patients suffering from RA. We found this study less methodologically sound compared to PX 88 which also tested analgesia for RA patients but found no statistically significant difference. Similarly, we found Reuter's study of pain in tonsillectomy patients

(CCX 29) methodologically unsatisfactory. We have, accordingly, accorded them little weight.

11. We found Dr. Gilbert's subsequent attempt (Tr. 971, 978, 984) to qualify his opinion as to the equipotency of ASA and APAP by confining it to "mild" pain or "mild to moderate" pain as distinguished from "moderate to severe" pain unclear and confused, entirely lacking in credibility and unsupported by any medical studies.

also an analgesic, because it would reduce the inflammation of the sprained ankle, and he should be free of pain in a shorter period of time. (Tr. 1359.)

He also stated that he thought the patient might get more relief from ASA over a period of time because ASA attacks the site of pain. (Tr. 1235–39.) Dr. Koelle's reasoning was that ASA achieved its analgesic effect primarily through peripheral, rather than central nervous system ("CNS") action. He thought the predominantly peripheral action of ASA has been demonstrated by the research concerning ASA's ability to reduce inflammation which is achieved by peripheral action at the site of the pain. There is evidence that APAP acts both peripherally and on the CNS, but Dr. Koelle was not prepared to say which action predominates with APAP. He has concluded, though, that APAP acts peripherally to a lesser extent than ASA, and thus would have less of an effect in reducing pain at the site. (Tr. 1232–41.)

Dr. Blau, a practicing rheumatologist, also testified that ASA was a superior analgesic for patients suffering from rheumatic disorders accompanied by inflammation. (Tr. 1395–97.)

We found Dr. Weissmann's and Dr. Koelle's hypotheses and expectations as to the superior analgesic effect of ASA for conditions with an inflammatory component reasonable. However, we note that neither of these prominent, knowledgeable and careful medical researchers pressed the claim of superior analgesia for these conditions beyond the point of informed expectation. Thus, we conclude that there is reputable evidence in the medical literature and in the well-considered opinions of experts in the field, that ASA *may* be a more effective analgesic for conditions which have an inflammatory component.[12] However, in evaluating whether there has been "any false description or representation, including words or symbols tending falsely to

describe or represent the same" (15 U.S.C. § 1125(a)), we cannot give much weight to these expectations and opinions which after all are basically speculations. The data from well-conducted tests of the comparative analgesic effects of ASA and APAP demonstrate that they are equally effective as analgesics for conditions which are associated with inflammation and for those which are not. Thus we conclude that the preponderance of the reliable evidence indicates that ASA and APAP are equally effective analgesics at OTC levels for conditions which are associated with inflammation or have inflammatory components.

In light of the foregoing findings, we conclude that AHP has made false representations concerning the properties of its product Anacin by claiming 1) that Anacin is a superior analgesic to Tylenol generally, and 2) that Anacin is a superior analgesic to Tylenol for conditions which are associated with inflammation or have inflammatory components. As to the third representation, that Anacin at OTC dosages reduces inflammation in the conditions listed in the advertisements to a clinically significant extent, the state of medical knowledge and research is not such as to allow us to reach a definitive conclusion as to the falsity of this claim. But since we find that the three claims are integral and inseparable, we find that the advertisements as a whole make false representations for Anacin and falsely disparages Tylenol in violation of the Lanham Act.

There is substantial evidence that consumers have been and will continue to be deceived as to the relative efficacy of the two products and that this deception is injuring, and will continue to injure, Tylenol's reputation among consumers. Accordingly, McNeil is entitled to a permanent injunction restraining plaintiff AHP, its agents, servants, officers and all those in privity with it from publishing or inducing any television or radio network or local station, newspaper, magazine, trade periodical or

12. The IAP drew no more definite conclusion: [A]cetominophen is considered to be equivalent to aspirin in its analgesic effect, although the lack of anti-inflammatory action might make it less useful in conditions having an inflammatory component. (IAP Report at 35413.)

other periodical to publish or from using in connection with any other promotional activity, the "Your Body Knows" advertisement or any other advertising or promotional material which contains, in the context of a representation as to any anti-inflammatory property of Anacin, the representation that Anacin is a superior analgesic generally or a superior analgesic for conditions which are associated with inflammation or have inflammatory components.

In light of these conclusions, we deny AHP's request for injunctive relief and damages and dismiss the complaint.

This memorandum opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Costs and attorneys' fees to neither party.

Settle order on notice within ten days.

SO ORDERED.

## AMENDED OPINION

The Court's August 18, 1977 opinion is hereby amended to include the attached Appendix A as an appendix to the opinion.

SO ORDERED. ·

## APPENDIX A

| | |
|---|---|
| PX–13 | McNeil complaints to National Advertising Division of Better Business Bureau re ANACIN advertisements (Two letters to Gertenbach (NAD) from Frazza dated 12/21/76 and 2/4/77; letter to Mooney from Frazza dated 3/30/77) |
| PX–14 | McNeil complaints to CBS re ANACIN advertisements (Letter to Hinton from Dobbins dated 12/29/76; Letter to Frazza from Purkert dated 12/29/76; Letter to Purkert from Frazza dated 1/26/77) |
| PX–15 | McNeil complaints to ABC re ANACIN advertisements (Two letters to Frazza from Gitter dated 12/23/76 and 3/7/77; letter to Gitter from Dobbins dated 12/29/76; three letters to Gitter from Frazza dated 1/27/77, 2/4/77 and 3/16/77; memo to Frazza from Gitter accompanying letter of 3/7/77 dated 3/8) |
| PX–16 | McNeil complaints to NBC re ANACIN (Three letters to Daniels from Frazza dated 12/21/76, 2/3/77 and 3/16/77; two letters to Daniels from Dobbins dated 12/29/76 and 3/21/77; letter to Daniels from Cohen dated 5/24/77; letter to Frazza from Daniels dated 2/17/77) |
| PX–18 | McNeil complaints to print media re ANACIN (Letter to Davidson from Frazza dated 2/3/77; two letters to Frazza from Perle dated 2/9/77 and 2/15/77; letter to Durrell from Frazza dated 2/8/77) |
| PX–20A | ASI Market Research Report, Audience Reaction Test, to 30-second Anacin "Let Your Body Tell You" commercial, Nov. 29, 1976 |
| PX–24 | Multz, Bernard, Blechman, Zane, Restifo, and Varady, A Comparison of Intermediate-dose Aspirin and Placebo in Rheumatoid Arthritis, Clinical Pharmacology & Therapeutics. 15:310–315 (1974) |
| PX–30 | Koch-Weser, Drug Therapy: Acetaminophen, N. England Journal of Medicine 295:1297–1300 (1976) |
| PX–32 | Dentists Prefer Aspirin to Codeine, American Druggist 169:46 (1974) |
| PX–52 | Burke Marketing Research Inc., Day after Recall Report of 60-second Tylenol Pain Reliever "Evelyn Turner" commercial, May 1976 |
| PX–62 | Vane, Weissmann and Zurier, Pain and Prostaglandins: New Clinical Perspectives, Science and Medicine Pub. Co., Inc., (1977) |
| PX–63 | Woodbury and Fingle, "Analgesic-Antipyretics, Anti-Inflammatory Agents and Drugs Employed in the Therapy of Gout", The Pharmacological Basis of Therapeutics, MacMillan Pub. Co., Inc., New York, Fifth Edition, 325–348 (1975) |
| PX–64 | Zurier, "Prostaglandins", Mediators of Inflammation, Planum Press, New York, 163–180 (1974) |
| PX–65 | Hamberg, Inhibition of Prostaglandin Synthesis in Man, Biochem. and Biophys. Res. Commun. 49:720–726 (1972) |

PX–66 Smith & Willis, Aspirin Selectively Inhibits Prostaglandin Production in Human Platelets, Nature New Biol., 231:235–237 (1971)

PX–67 Vane, "Mode of Action of Aspirin and Similar Compounds", Prostaglandin Synthetase Inhibitors, Raven Press, New York, 155–163 (1974)

PX–68 Vane, Inhibition of Prostaglandin Synthesis as a Mechanism of Action for Aspirin-like Drugs, Nature New Biol., 231:232–235 (1971)

PX–69 Hamberg, Svensson and Samuelsson, Prostaglandin Endoperoxides. A New Concept Concerning the Mode of Action and Release of Prostaglandins, Proc.Nat.Acad.Sci. USA. 71:3824–3828 (1974)

PX–70 Weissmann, Rheumatoid Arthritis: How the Non-Steroidal Anti-Inflammatory Agents Work, Medical Times, 104:64–72 (September 1976)

PX–73 Weissmann, New Thoughts on Steroids, Inflammation and Infection, Infectious Diseases 7:4, 11, 21–22 (March 1977)

PX–74 Van Der Meer and Den Oudsten, Clinical Trial of the Therapeutic Value of Certain Antirheumatic Drugs, Ann.Rheum.Dis. 19:251–256 (1960)

PX–75 Jick, Pinals, Ullian, Slone and Muench, Dexamethasone and Dexamethasone-Aspirin in the Treatment of Chronic Rheumatoid Arthritis—A Controlled Trial, Lancet, 2:1203–1205 (1965)

PX–76 Barnardo, Currey, Mason, Fox and Weatherall, Mefanamic Acid and Flufenamic Acid compared with Aspirin and Phenylbutazone in Rheumatoid Arthritis, Brit.Med.J., 2:342–343 (1966)

PX–77 Dornan and Reynolds, Comparison of Ibuprofen and Acetylsalicylic Acid in the Treatment of Rheumatoid Arthritis, CMA Journal, 110:1370–1372 (1974)

PX–79 Abramowicz, Management of Tennis Elbow, in The Medical Letter on Drugs and Therapeutics, The Medical Letter, Inc., 19: No. 8 (Issue 477) 33–36 (April 1977)

PX–88 Huskisson, Simple Analgesics for Arthritis, Brit.Med.J., 4:196–200 (1974)

PX–89 Beaver, Mild Analgesics in the Treatment of Pain, Modern Treatment, 5:1094–1119 (1968)

PX–91A Hollander, J. Editor, Arthritis and Allied Conditions: A Textbook of Rheumatology, Lea and Febiger, Philadelphia, Eighth Edition, p. 1402 (1972)

PX–91B Hollander, J. Editor, Arthritis and Allied Conditions: A Textbook of Rheumatology, Lea and Febiger, Philadelphia, Eighth Edition, pp. 1056–1057 (1972)

PX–92 The Medical Letter on Drugs and Therapeutics, The Medical Letter, Inc., 13:73–76 (1971)

PX–93 Hajnal, Sharp and Popert, A Method for Testing Analgesics in Rheumatoid Arthritis Using a Sequential Procedure, Ann.Rheum.Dis. 13:189–206 (1959)

PX–97 British Pharmaceutical Codex 1973, The Pharmaceutical Press, London 318–319

PX–101 Hui, "Otorhinolaryngology: Maxillary Sinusitis, Acute Sinusitis, Chronic Sinusitis, Acute and Chronic Tonsillitis, Peritonsillar Abscess, Cavernous Sinus Infection, Acute Pharyngitis, Epistaxis, and Ozena", Pharmacotherapeutics of Oral Disease, McGraw-Hill Book Co., New York, 457–458

PX–104 "The Pain of Tennis Elbow", Pain: Current Concepts on Pain and Analgesia, Vol. 4, No. 3:1–3 and 12 (1977)

PX–108 Halpern and Bonica, "Analgesics", in Modell, Drugs of Choice 1976–77, The C. V. Mosby Co., St. Louis, 195–204 (1976)

PX–110 Dorland's Illustrated Medical Dictionary, W. B. Saunders, Philadelphia, Twenty-fifth Edition, 1039, 1425 and 1547 (1974).

CCX–23 Batterman & Grossman, Analgesic Effectiveness and Safety of N-Acetylpara-Aminophenol, Fed.Proc. 14:316–17 (1955).

CCX–24 Wallenstein & Houde, Clinical Comparison of Analgesic Effectiveness of N-Acetylpara-Aminophenol Salicylamide and Aspirin, Fed.Proc. 15:414 (1954).

CCX–25 Lasagna, et al., A Comparison of Acetophenetidin and Acetaminophen; I. Analgesic Effects in Postpartum Patients, J. Pharmac.Exp.Thera. 155:296–300 (1967).

CCX–27 Parkhouse & Hallinon, A Comparison of Aspirin and Paracetamol. Brit.J.Anest. 39:147 (1967).

CCX–28 Moertel, et al., <u>A Comparative Evaluation of Marketed Analgesic Drugs</u>, New Engl.J. Med. 286:813 (1972).

CCX–29 Reuters & Montgomery, <u>Aspirin vs. Acetaminophen after Tonsillectomy</u>, Arch.Otolarng. 80:214 (1964).

CCX–29A Cooper & Beaver, <u>A Model to Evaluate Mild Analgesics in Oral Surgery Outpatients</u>, Clin.Pharmac.Thera. 29(2):241–50 (1976).

CCX–49 Vane, <u>Mode of Action of Aspirin and Similar Compounds</u>, in Robinson & Vane, Eds., PROSTAGLANDIN SYNTHETASE INHIBITORS, Raven Press (New York 1974) pp. 155–163.

CCX–52 <u>Buckingham, Bursitis and Calcific Tendonitis</u>, in Conn, CURRENT THERAPY, W. B. Saunders Co. (Philadelphia 1977) (in evidence as CCX 6).

CCX–56 Yaccabucci, <u>Platelet Defects of Importance in Oral Surgery</u>, J.Oral Surg. 30:478–85 (1972).

CCX–57 Hersch, <u>A Clinical Study Comparing the Incidence of Post-operative Bleeding in Patients using Salicylate-containing Analgesics versus Acetaminophen Analgesics</u>, J. Bergen County Dental Soc. 50(5):6–8, 14 (1974).

CCX–74 PX 20 ASI Market Research presentation to AHP of two ANACIN commercials.

CCX–102 Gallup & Robinson Report dtd March 20, 1977 and TPT Report dtd Apr. 3, 1977.

CCX–102A TPT Score History Gallup & Robinson Report dtd May 13, 1977.

CCX–105 Raw Verbatims, Feb. 2, 1977 (CCX 80).

CCX–106 Raw Verbatims, March 20, 1977 (CCX 102).

CCX–107 Raw Verbatims, April 8, 1977.

CCX–108 Raw Verbatims, Ladies Home Journal (CCX 103).

CCX–123 Lettin, <u>Diagnosis and Treatment of Sprained Ankle</u>, Brit.Med.J. p. 1056–60 (April 1963).

CCX–124 Caro, et al., <u>Diagnosis and Treatment of Injury of Lateral Ligament of the Ankle Joint</u>, Lancet pp. 720–23 (Oct. 1964).

CCX–136B Sveen, et ano., <u>Paracetamol/codeine in relieving pain following removal of impacted mandibular third molars</u>, Int.J.Oral Surgery 4(6):258–66 (1975).

CCX–146 Boardman, <u>Clinical Measurement of the Anti-Inflammatory Effects of Salicylates in RA</u>, Brit.Med.J. Nov. 4, 1967.

CCX–147 Calabro, <u>Anti-Inflammatory Effect of Acetylsalicylic Acid in RA</u>, Clinical Orthopedics, July-Aug. 1970.