**ORTHO PHARMACEUTICAL CORPORATION,**
Plaintiff,

v.

**COSPROPHAR, INC., Defendant.**

**No. 91 Civ. 3003 (CHT).**

United States District Court,
S.D. New York.

Aug. 10, 1993.

Patterson, Belknap, Webb & Tyler, New York City (Thomas C. Morrison, Andrew D. Schau, David C. McIntyre, and Madonna M. Malin of Johnson & Johnson, of counsel), for plaintiff.

Piper & Marbury, New York City (I. Scott Bass, Alfred Ferrer III and Diane C. McEnroe, of counsel), for defendant.

*OPINION and ORDER*

TENNEY, District Judge:

Plaintiff Ortho Pharmaceutical Corporation ("Ortho"), a Delaware corporation and wholly owned subsidiary of Johnson and Johnson, Inc., brought this suit in 1991 alleging false description and representation of goods in interstate commerce pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1993) and sections 349 and 350 of the New York General Business Law (McKinney 1988). Defendant Cosprophar, Inc., ("Cosprophar") is an Italian-based corporation organized under the laws of New York and doing business within this country under the name Korff USA ("Korff"). Cosprophar manufactures and distributes lines of cosmetics under the name ANTI–AGE. Ortho seeks a permanent injunction to prevent Cosprophar from advertising that the ANTI–AGE products contain retinol, that they are effective in diminishing wrinkles or other effects of photoaging, and that they have been proven effective by scientific evidence. Ortho further seeks an order requiring Cosprophar to disseminate corrective advertising, to recall the ANTI–AGE products and consumer brochures, and to pay attorneys' fees pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117(a) (1993). At the close of plaintiff's case in a bench trial in December 1992, Cosprophar moved for dismissal of plaintiff's claims, arguing that Ortho had failed to establish either that they had standing or that the statements made in Cosprophar's advertising are false. The court reserved decision. For the reasons given below, the relief requested by Ortho is denied because this court concludes that the plaintiff has not established the elements of standing required by the Lanham Act. The court also dismisses Ortho's state law claims as Ortho failed to show that defendant's advertising mislead consumers.

## BACKGROUND

Some basic chemical nomenclature is a prerequisite to understanding several issues in the case. Vitamin A is necessary for the growth, development, and maintenance of the skin. All of the chemical isomers and metabolites of Vitamin A are known by the generic term "retinoid." The naturally occurring form of Vitamin A is "retinol," also known as Vitamin A acid.[1] When retinol is esterified with either palmitic acid or acetic acid, it forms "retinyl palmitate" or "retinyl acetate," respectively. These esters are classified by the Food and Drug Administration ("FDA") as "cosmetic" ingredients, and are considered safe and non-irritating in concentrations of up to 1%.

Cosprophar manufactures cosmetics.[2] Many of its products contain either retinyl palmitate or retinyl acetate.[3] Ortho manu-

---

1. Several dictionaries define retinol simply as Vitamin A. *See Webster's Ninth New Collegiate Dictionary* (1991); *McGraw–Hill Dictionary of Scientific and Technical Terms* (4th ed. 1989); *The Concise Oxford Dictionary of Current English* (8th ed. 1990); *American Heritage Dictionary,* (2nd college ed. 1982).

2. The Food and Drug Cosmetic Act of 1938 defines "cosmetics" as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance...." 21 U.S.C. § 321(i)(1).

3. Specifically, the product lines ANTI–AGE RETARD, ANTI–AGE RETARD LIPOSOME, and ANTI–AGE contain varying concentrations of retinyl acetate. ANTI–AGE SUPER, ANTI–AGE SUPER LIPOSOME, and ANTI–AGE SPECIAL contain retinyl acetate in combination with "retinyl palmitate polypeptide," the name Cosprophar gives to a form of retinyl palmitate that it pur-

factures drugs, including the prescription medication RETIN–A which contains tretinoin, a retinoid that the FDA classifies as a drug.[4] Ortho sells RETIN–A in a variety of formulations in which the strength of the tretinoin ranges between .01% and .1%. Tretinoin is approved by the FDA only for the treatment of acne. Although Ortho may not promote or encourage use of the drug for purposes other than those on the FDA-approved labeling, physicians may lawfully prescribe RETIN–A for "off-label" purposes.[5]

In January 1988, an article appeared in the Journal of the American Medical Association ("JAMA") that advocated the use of tretinoin for the treatment of photodamaged skin.[6] Jonathan S. Weiss et al., *Tropical Tretinoin Improves Photodamaged Skin*, 259 JAMA 527–32 (1988). The JAMA article and subsequent articles verifying the study upon which the initial article was based received widespread media attention. One result of the publicity was that "off-label" prescriptions for RETIN–A increased. A second result was that Ortho began developing a product called RENOVA, which is identical to RETIN–A .05% concentration, except that its vehicle cream is formulated with different inactive ingredients. Ortho has sought FDA approval of RENOVA as a drug prescribed for the treatment of photoaged skin.

Also in 1988, Cosprophar introduced its ANTI–AGE RETARD line of products to the United States market. Cosprophar later introduced additional lines of varying "power" including ANTI–AGE SUPER (in 1990), ANTI–AGE SPECIAL (in 1991), ANTI–AGE "LIPOSOME" (in 1991) and ANTI–AGE SUPER LIPOSOME (in 1991). Cosprophar also has a line of makeup called ANTI–AGE COLOUR. Cosprophar has created a variety of products for sale within each line, and further divided each line into age-related sub-categories.[7] Thus, this lawsuit concerns 117 products listed within several different product lines.

The retail prices of the various products depend on the individual product and the target group, with products targeting older women costing more within each line. For example, in the ANTI–AGE RETARD 25 to 35 line, a 5–ounce container of "Milk Cleanser" or "Toner" sells for $23.00, whereas the same product costs $32.00 in the ANTI–AGE RETARD 55 and Over line. Similarly, a 1.6 ounce container of ANTI–AGE RETARD 55 and Over "Repair Complex" costs $110.00, while a 1.6 ounce container of ANTI–AGE "LIPOSOME" 45 to 55 "Repair Complex" costs $410.00 and a 1.6 ounce container of ANTI–AGE "LIPOSOME" 55 and Over "Repair Complex" costs $440.00. Plaintiff's Exhibit 97. These latter two products are among the most expensive cosmetics sold in this country.

Cosprophar has developed the marketing approach of selling its cosmetics solely through pharmacies. It advertises and pro-

---

chased from Brooks Industries, a cosmetic ingredient manufacturer located in Plainfield, New Jersey. The "polypeptide" is an amino acid complex that Brooks Industries combines with the retinyl palmitate.

**4.** The Food and Drug Cosmetic Act of 1938 defines "drugs" in part as "articles (other than food) intended to affect the structure or any function of the body...." 21 U.S.C. § 321(g)(1)(C).

**5.** 21 C.F.R. § 312.7 (1992). For a more detailed discussion, see *infra* n. 16.

**6.** Unrefuted expert testimony at trial established that skin aging comes in two forms. "Intrinsic aging" is the inevitable aging that occurs at a rate and in a manner largely determined by a person's genetic make-up. "Photoaging" results from exposure to sunlight; changes in the skin due to such exposure are referred to collectively as photodamage.

**7.** Each skin care cosmetic line includes, among others, cleansers, toners, day creams, night creams, cleansing masks, emulsions, and eye contour creams. The age formulations appear to be in ten year groupings: For example, ANTI–AGE RETARD products are available in formulations for women 25 to 35 years old, 35 to 45, 45 to 55, and 55 and Over, with concentrations of retinyl acetate increasing with the age of the target groups.

The products available in the makeup line include lipsticks, lip pencils, mascaras, eye shadows, eye pencils, face powders, blush-ons, and make-up foundations. Apparently, the makeup line has age divisions similar to the skin care lines.

motes its products through newspaper and magazine "advertorials"[8] in publications such as *The New York Times, Cosmopolitan,* and *Vogue.* Cosprophar also distributes product bulletins to consumers at retail pharmacies. Cosprophar does not employ a retail sales staff, but provides training to the pharmacies' sales staffs; it also provides them with product bulletins that contain technical and marketing information.

Several of Cosprophar's ads associated their products to "retinol" or claimed that the products contained "Super retinol." The ads indicated that the primary difference between the Cosprophar products and those based on tretinoin is that the former had no side effects. Frequently, the ads referred to scientific testing that had shown the efficacy of the Cosprophar products in the "war on wrinkles." Evidence of the products' success was said to come from the tests of Professor Puschmann of the Hamburg Clinic of Experimental Dermatology, in Germany, who found that the products "visibly reduced the number and depth of wrinkles" in tests "carried out ... on men and women between 22 and 43 years old."

Cosprophar, in fact, had three studies performed involving Dr. Puschmann. The studies were conducted at the Alfred–Marchioni-ni–Institute ("AMI") in Reinbeck, Germany, a contract research facility partially owned by Dr. Puschmann. Cosprophar also had its products tested by AMA Laboratories, Inc., in New City, New York and by the Xienta Institute for Skin Research in Pennsylvania. Cosprophar also tried to have the psychological effects of its products measured by having a New York psychologist study the response to questions about self-image asked of twenty-six women using either ANTI–AGE SUPER or NIVEA cream. Ortho and Cosprophar heatedly dispute what the results of these tests mean, as well as the validity of the tests themselves.

## DISCUSSION

### I. POST–TRIAL EVIDENTIARY SUBMISSIONS

Along with their voluminous post-trial briefs and proposed findings of fact, both parties have submitted additional evidence for the court's consideration. Ortho seeks to introduce three market research surveys that this court rejected at trial. Cosprophar seeks to introduce advertising of certain skin care products by other cosmetic companies that purport to have "anti-age" qualities. The court accepts neither submission.

### A. *Ortho's Market Surveys*

At trial, Ortho offered three surveys which it had commissioned. Plaintiff's premarked exhibits are Exhibit 8, a report dated May 13, 1988 and entitled "Update on Physicians Usage of and Attitudes toward RETIN–A"; Exhibit 9, a report dated June 13, 1988 and entitled "RETIN–A Consumer Awareness and Usage Telephone Survey"; and Exhibit 10, a report dated April 16, 1990 and entitled "RETIN–A Consumer Awareness and Usage Study." Plaintiff claims that the surveys "corroborate the testimony and the evidence from the print and news media regarding the overwhelming consumer awareness of RE-TIN–A's use for the treatment of photo-aged skin." Plaintiff's Memorandum of Law in Support of the Admissibility of Its Market Surveys at 2. Ortho attempted to introduce these items during the direct examination of Alfred Altomari, the director of consumer marketing for the dermatological division of Ortho. The court ruled the surveys were inadmissible because they were hearsay not falling within any exception under Federal Rule of Evidence 803. Trial Transcript ("Tr.") 396–416. Ortho urges again that the surveys are admissible because they fall within the business records exception of Rule 803(6). Ortho also argues that these types of surveys are routinely admitted in Lanham Act litigation.

---

**8.** "Advertorials" are advertisements formulated in the same style as news articles, so as to enhance the seriousness and credibility of their advertising. The parties agree that advertorials are the print equivalent of the "infomercials" which are familiar to late-night television viewers. Cosprophar only runs its advertorials in newspapers that agree to place the advertisement adjacent to a news item.

### 1. Rule 803(6)

The relevant portion of Rule 803(6) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(6) **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

■■■ This exception to the hearsay rule was developed to modify the common law requirement of producing at trial all participants in the gathering and recording of daily business activity, a requirement which had grown unwieldy because of the growth and industrialization of American business and the concomitant division of labor. *See* Fed. R.Evid. 803(6) advisory committee notes; *Palmer v. Hoffman*, 318 U.S. 109, 112 n. 2, 63 S.Ct. 477, 480, 87 L.Ed. 645 (1943), *reh'g denied* 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163 (1943) (citing *Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co.*, 18 F.2d 934, 937 (2d Cir.1927) (Learned Hand, J.)). Thus a single witness can introduce evidence through documents that might otherwise require the testimony of hundreds, if not thousands, of witnesses. The hallmark of documents admitted under the business records exception is that they are trustworthy and reliable. *Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987) ("The principal precondition to admission of documents as business records ... is that they have sufficient indicia of trustworthiness to be considered reliable."); *cf. Palmer*, 318 U.S. at 113–14, 63 S.Ct. at 480 (rationale behind the predecessor to Rule 803(6) was that routine reflections of day to day

operations of a business were considered trustworthy). The records introduced can be records of an entity not a party to the proceedings, and the foundation for their receipt can be made by a witness who is not an employee of the preparer. *Saks Int'l*, 817 F.2d at 1013. Nevertheless, the "with knowledge" requirement of Rule 803(6) dictates that "the court must be able to determine from some appropriate source—from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things—that the foundational element has been met." *White Indus., Inc. v. Cessna Aircraft Co.*, 611 F.Supp. 1049, 1060 (W.D.Mo.1985).

■■■ There was inadequate foundation as to Exhibits 8, 9, and 10 that Mr. Altomari was a "person with knowledge" within the meaning of the Rule. The trustworthiness of the documents is also unclear because of the foundation that was laid. Mr. Altomari, who had been in the marketing division for four years at the time of trial, testified that Ortho regularly conducts market research, that Ortho has a full-time market research department, and that he commissions market research through the department which in turn hires independent contractors. Tr. 393–94. With regard to Exhibit 8, he testified that he was briefed on its contents by his boss, Les Riley, who was one of the addressees of the report. Tr. 397. But his name does not appear on the face of the document as one of the Ortho employees to whom a courtesy copy was sent. He did not commission the work, nor did he play any role in its preparation. He did identify Pamela Doyle as an Ortho market research manager who commissioned the study and then wrote the summarizing report that is Exhibit 8. Tr. 399. However, it is through her that the initial, independently gained data was distilled. Tr. 401–02. There was no testimony that Mr. Altomari saw the original data or that he had any knowledge of the steps that Ms. Doyle took in preparing the report. The fact that Ortho may have relied upon the report in marketing makes no difference. The court cannot be assured of the accuracy of the document. Nor can the court or opposing counsel investigate the accuracy of the mate-

rial, which was and is being offered for the truth of its contents. *See* Tr. 412.

■ It is true that the underlying data has the indicia of reliability based on a presumption that an independent entity has a continuing contractual duty to report truthfully its findings. *White Indus., Inc.*, 611 F.Supp. at 1061. However, there appears to be no way to verify what Ms. Doyle did in analyzing this material. Indeed, Mr. Altomari testified that the first six pages of Exhibit 8, which constitute the "report,"[9] were not objectively prepared by Ms. Doyle: "[T]he preparation is really in tandem with her supplier that she authors it under her name but it represents her view points [sic] and also the view points [sic] of market research. And in this case suppliers she had used—she didn't conduct but she is the author and she signed off on it." Tr. 401–02. The court recognizes that "there is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person." *Saks Int'l, Inc.*, 817 F.2d at 1013. But where the entry is colored by the analysis and impressions of the person with first-hand knowledge, with no apparent checks on her selectivity of facts or her methodology, the "business record" cannot be relied upon for the truth of its contents.[10] To hold otherwise would invite unscrupulous companies to analyze unfavorable data in a disingenuous way as part of their "regularly conducted business activity," thereby obtaining enormous advantages in future litigation. *Cf. Palmer*, 318 U.S. at 113, 63 S.Ct. at 480 (allowing a railroad to introduce self-serving record of tort injury as a business record would open the door to allow any kind of report into evidence, so long as it was "regular," despite having little to do with the "business" of the litigants). Accordingly, Exhibit 8 will not be admitted into evidence.

■ Exhibit 9 also must be excluded. Exhibit 9, prepared in 1988, was written by R. Linbeck, a contemporary of Ms. Doyle, for Mr. Altomari's boss at the time, Jim Faye. Tr. 403, 409–410. Mr. Faye, in turn, reported to Mr. Riley. Tr. 403. Exhibit 9 once again does not include Mr. Altomari as a person who should be made aware of its contents. Although Mr. Altomari testified that these reports were done "in the regular course of business," Tr. 413, there was no indication of what constituted such a regular course. The witness gave no testimony about the techniques used by his co-workers or about the efforts at consistency between the various reports prepared in his department. Again, the reliability of the exhibit cannot be measured: Mr. Altomari had insufficient knowledge of the methods of preparation, the selectivity and methodology of Mr. Linbeck could not be determined, and the testimony that would have provided a proper foundation was not offered.

■ The one major distinction in the factual scenario for Exhibit 10 is that this report was addressed to Mr. Altomari. This report, prepared in 1990 by Ortho marketing research employee Virginia Heller, was a follow-up study to that in Exhibit 9. However, once again, the accuracy of the report could not be verified. As set out in the margin, Mr. Altomari only testified that reports such as these are prepared in the "regular course of business" without elaborating on procedure, methodology, or accountability.[11] Mere repetition of conduct, without

9. The remaining pages are tables and two appendices. One appendix is a copy of the telephone survey. The second appendix and the tables bear no indication of who tabulated and prepared them. There is also no discussion of methodology except for a two sentence paragraph in the "report."

10. Although "opinions" are included within the rule as admissible, the Advisory Committee noted, "Entries in the form of opinions were not encountered in traditional business records in view of the purely factual nature of the items recorded, but they are now commonly encoun-

tered with respect to medical diagnoses, prognoses, and test results, as well as occasionally in other areas." Fed.R.Evid. 803 advisory committee notes. The court is not convinced that in-house market analysis of independently collected data is the type of opinion admissible under the Rule.

11. The following is the entire foundation laid concerning the actual preparation of the report, aside from questions eliciting descriptive answers about the preparer and the subject matter:
   Q. Did Ms. Heller prepare this entire report?
   A. Yes, she did.

some indicia of trustworthiness, cannot constitute "regular business activity" that is admissible under Rule 803(6). Accordingly, Exhibits 8, 9, and 10 are excluded as hearsay.

### 2. Lanham Act cases

■■■ In addition to arguments about the admissibility of the surveys under the language of the business rule exception, Ortho argues that other courts have allowed such surveys into evidence in Lanham Act cases. Those cases, however, are factually distinct from the present one. In *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 614 F.Supp. 1278 (S.D.N.Y.1985), the plaintiff sought to prove consumer confusion by introducing tests conducted by the defendant for purposes other than showing the possibility of confusion between the parties' products. *Id.* at 1313. Although the court did not discuss the grounds of admissibility of one of the tests, presumably it could be deemed a statement of a party opponent within the meaning of Federal Rule of Evidence 801(d)(2). The second survey in question was introduced upon the testimony of an employee of ASI, the independent market research company that had conducted the test. *Id.* at 1314. Similarly, an ASI study conducted by the plaintiff that went directly to the question of consumer confusion was relied upon by the court in *Vidal Sassoon Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 275–277 (2d Cir.1981). The court also relied upon the defendant's internal tracking study, which revealed a significant increase in the awareness and purchases of defendant's product after commercials that were the subject of the suit had aired. *Id.* at 278–79. From this latter study by the defendant, the court concluded that the trial court had properly inferred that the plaintiff might be dam-

aged unless an injunction was issued to stop the offending commercials. Again, the court appears to have been assured of the trustworthiness of the evidence, because the plaintiff was using evidence collected or commissioned by the defendant. *See American Home Products Corp. v. Johnson and Johnson*, 436 F.Supp. 785, 793–96 (S.D.N.Y.1977) (court evaluated tests and raw data compiled by Gallup and Robinson and ASI, both independent analysts), *aff'd*, 577 F.2d 160 (2d Cir.1978).

The one other case that Ortho relies upon in this circuit is *Johnson & Johnson v. Carter–Wallace, Inc.*, 487 F.Supp. 740 (S.D.N.Y. 1979), *rev'd on other grounds*, 631 F.2d 186 (2d Cir.1980). In that case, the plaintiff introduced consumer surveys that it had commissioned and the defendant introduced studies of its commercials that were "commissioned ... in the regular course of business before the inception of th[e] litigation." *Id.* at 747. There are two obvious distinctions between that case and the one at bar. First, the surveys were done completely independently. *Id.* at 744, 746–47. Thus, the issue of trustworthiness was minimized. Indeed, the defendants in *Johnson & Johnson* went so far as to introduce the verbatim answers of the consumers in the marketing research tests. *Id.* at 747. Second, Judge Motley did note that Carter–Wallace's surveys were commissioned in the regular course of business, but the opinion is silent as to how the surveys were introduced and what witness was used for the introduction of the surveys. As indicated above, it was in part the insufficiency of the testimony from Mr. Altomari that gives this court pause.

The cases cited by Ortho from other circuits either avoid the evidentiary questions

Q. And was this part of her job?
A. Yes.
Q. And would everything you said about the previous reports apply to this in terms of the reason you do these kinds of studies?
A. Yes, everything I mentioned would apply.
Q. And was this report commissioned in the normal course of Ortho's business?
A. Yes, it was.
Q. Was it the normal course of Ortho's business to commission such reports?
A. Yes, it was, and it still is.

Q. And was this report prepared and maintained in Ortho's files in the normal course of business?
A. Yes.
Q. And is it the normal course of Ortho's business to prepare and retain such reports?
A. Yes, it is.
Q. And this report had nothing to do with this litigation in terms of it's the reason for its commission [sic]?
A. No, it did not.
Q. Your Honor, I Offer Plaintiff's Exhibit 10.... Tr. 415–416.

or are unpersuasive. In *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 199 (D.D.C.1989), *aff'd in part, vacated in part on other grounds*, 913 F.2d 958 (D.C.Cir.1990), the district court found support for one of its findings of fact by considering audience focus group and survey research. There is no indication in the opinion, however, as to the means of introduction or whether the truthfulness of the surveys was in question. The court in *ALPO Petfoods* does note that the consumer survey was conducted by an independent research firm; that research was ultimately used by the court for a finding adverse to Ralston's interest. *Id.* In a second case relied upon by Ortho, the court considered qualitative communication checks that were conducted as part of the "routine procedure" for the defendant's advertising. *Borden, Inc. v. Kraft, Inc.*, 224 U.S.P.Q. 811, 814, 1984 WL 1458 (N.D.Ill.1984). As distinguished from this case, these checks were supported by a study commissioned by Kraft conducted by an independent expert in the field of market research. *Id.* at 814–15. Finally, in *Conopco, Inc. v. May Dep't Stores Co.*, 784 F.Supp. 648, 655, *amended, in part* 797 F.Supp. 740 (E.D.Mo.1992), the court discussed the plaintiff's tracking studies. However, these too were supported by independent research studies, and were not merely reports of independent research distilled by one party's employees. *Id.* at 664, 677 (giving weight to "properly conducted surveys").

■ This court is not holding that market research surveys as a rule are inadmissible, or even those surveys conducted by a party's in-house research staff. Indeed, in trademark and Lanham Act cases, properly conducted surveys are a valuable tool in gauging consumer perception and are accordingly given great weight. *Anheuser–Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 638–39 (8th Cir.1984); *see Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 401 (8th Cir. 1987). As another district court has written:

> A survey is considered to be properly conducted if the survey was fairly and scientifically conducted by qualified experts and impartial interviewers, if the study drew responses from a sample of a relevant

portion of potential customers, if the questions upon which the results relied do not appear to be misleading or biased, and if the recordation of responses was handled in a completely unbiased manner.

*Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.*, 758 F.Supp. 512, 524 (E.D.Mo.1991), *aff'd in part, rev'd in part on other grounds*, 989 F.2d 985 (8th Cir.1993), *reh'g denied* (1993) (en banc). This definition appears to be sound, and serves as a guide to evaluating the surveys at issue here. *Cf. American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 n. 4, 663 (2d Cir.1979) (district court not clearly erroneous in rejecting survey evidence filled with methodological defects), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 55 (D.N.M.1985), *aff'd*, 828 F.2d 1482 (10th Cir.1987) (evidence from survey with equivocal results and methodological weaknesses was rejected for showing consumer confusion). This court cannot conclude that the surveys were "properly conducted" from the foundation laid by Mr. Altomari, and therefore concludes, again, that the surveys are inadmissible hearsay.

**B. The Advertisement of Non-party Cosmetic Companies**

■ Cosprophar asks the court to take judicial notice pursuant to Rule 201 of several ads run by other cosmetic companies in national consumer publications. The advertisements were published after the conclusion of the trial. These submissions are intended to demonstrate that Ortho's argument of suffering irreparable harm is belied by the plaintiff's decision "to permit similar advertising by others to continue." Defendant's Post-trial Reply Memorandum at 10.

Ortho cites *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir.1985) for the proposition that such alleged inaction on the part of Ortho negates a presumption of irreparable harm. In *Citibank*, the court found the presumption was negated when New York Citibank delayed bringing suit for nine months after having notice that Connecticut's Citytrust intended to open a New York branch. The court found that Citibank had made no initial objections to the branch, had made no

significant objections to Citytrust's advertising in the New York media, and had made no efforts to verify the opening of the branch. Other cases in this circuit have similarly held that where there is prolonged inaction on the part of a Lanham Act plaintiff in pursuing a defendant, the presumption of irreparable harm is negated. *See Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985) (per curiam).

Here, however, the conduct which is said to be relevant is Ortho's inaction in pursuing cosmetic companies that are not parties to the action. Ortho contends that it has taken several steps against some of the offending companies, including sending protest letters, initiating one lawsuit, and reaching settlement agreements. But even without these efforts, the presumption of irreparable harm is not diminished because companies other than the plaintiff may be running advertisements which might run afoul of the Lanham Act. The question is whether this defendant's conduct is prohibited by law. Furthermore, there is no indication that Ortho's conduct toward Cosprophar "undercuts a sense of urgency or of an imminent threat," which is needed to negate the presumption. *King v. Innovation Books*, 976 F.2d 824, 831 (2nd Cir.1992) (repeated objections by author to filmmaker and attempts to obtain the screenplay, tentative credits, and a copy of the film over an eight month period is not conduct that negated the presumption). Therefore, the submission is rejected as irrelevant and barred under Federal Rule of Evidence 402.[12]

## II. STANDING

■ From the pre-trial conferences before Judge Miriam G. Cedarbaum through the trial itself, the question of standing has been a heatedly contested issue. Referred to as either a "standing issue" or one of whether Ortho has suffered any injury, the issue is essentially whether Ortho is a proper plaintiff in this case. Ortho argues that there is no issue at all; it argues that because RETIN-A is known by consumers to have effects on the skin, the plaintiff is properly in the skin aging market. Ortho also contends that future sales of RENOVA, which it is confident will receive FDA approval, will be harmed by Cosprophar's allegedly misleading advertising. Cosprophar argues that Ortho is in the skin care market on the basis of illegal promotion of RETIN-A, that standing cannot be found on the basis of RENOVA's future sales, and that Ortho has failed to prove irreparable harm that is a prerequisite to the injunctive relief Ortho seeks.

The roots of the standing doctrine lie in the case-or-controversy requirement of Article III. The Supreme Court recently summarized the basic elements of this doctrine:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, see [*Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556, *reh'g denied*, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984) ] 468 U.S. at 756, [104 S.Ct. at 3327]; *Warth v. Seldin*, 422 U.S. 490, 508 [95 S.Ct. 2197, 2210, 45 L.Ed.2d 343] (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740–41, n. 16 [92 S.Ct. 1361, 1369, 31 L.Ed.2d 636] (1972);

---

**12.** The court notes, without deciding, that there is a close question as to whether these magazine ads can be introduced under Rule 201. That rule applies only to "adjudicative facts." Fed. R.Evid. 201(a). Adjudicative facts are those facts "concerning the immediate parties—who did what, where, when, how, and with what motive or intent." Fed.R.Evid. 201(a) advisory committee notes. *See In re Digby*, 47 B.R. 614, 619 (Bankr.N.D.Ala.1985) (adjudicative facts relate to parties to a proceeding); *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 244 n. 52 (5th Cir. 1976) (reviewing history or distinction between legislative and adjudicative facts). The existence of the advertisements of other cosmetic companies hardly fits within the definition. If the ads are considered adjudicative facts, they would likely satisfy one of the conditions of Rule 201(b), namely, that the facts are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The court would need to do little more than examine one of the magazines submitted by the defendant for proof of the advertisements. However, as discussed above, the conduct of other cosmetic companies is not relevant. Rule 201 cannot be used as a mechanism to avoid the limits of Rule 402.

and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore [v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)], at 155 [110 S.Ct. at 1722] (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 102 [103 S.Ct. 1660, 1665, 75 L.Ed.2d 675] (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42 [96 S.Ct. 1917, 1926, 48 L.Ed.2d 450] (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision." *Id.* at 38, 43, 96 S.Ct. at 1924, 1926.

*Lujan v. Defenders of Wildlife,* —— U.S. ——, —— – ——, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992) (footnote omitted). The Court also made clear that the burden of establishing the elements of standing falls upon the plaintiff, and that the burden of proof increases "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at —— – ——, 112 S.Ct. at 2136–37. This court concludes that Ortho has failed to meet the first of the elements necessary for standing.

■ In this action, the legally protected interest that Ortho claims arises from the Lanham Act. Section 43(a) provides that:

(1) Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

\* \* \* \* \* \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125(a). The language of the act is "strikingly general"; "because the statute is remedial and because its words are so clearly expansive, it should, generally speaking, be broadly construed." *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124 (2d Cir.1984) ("*PPX Enterprises I*"). However, the underlying intent of the act "is to regulate commerce within the control of Congress ... to protect persons engaged in commerce against unfair competition." 15 U.S.C. § 1127. Upon this basis, the Second Circuit has limited standing to commercial parties, excluding "mere consumers." *See PPX Enterprises I,* 746 F.2d at 124–25; *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.1971), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971); *see also Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 242 (S.D.N.Y.1990), *aff'd,* 923 F.2d 845 (2d Cir.1990). In order to have standing, a commercial party need not be in direct or indirect competition with the defendant, but must have "a 'reasonable interest to be protected' against alleged false advertising." *PPX Enterprises I,* 746 F.2d at 125 (quoting *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980) (in turn quoting 1A R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 5.04 at 35 (4th ed. 1981))). "[A]t a minimum, standing to bring a section 43 claim requires the potential for a commercial or competitive injury." *Berni v. Int'l Gourmet Restaurants of America, Inc.,* 838 F.2d 642, 648 (2d Cir. 1988).

The question upon which the issue of standing in this case turns is whether Ortho has shown that it has a reasonable interest to be protected under the statute. It is clear that Ortho and Cosprophar are not in direct competition given the nature of their products: one is a drug requiring a doctor's prescription, the other is a cosmetic available in a pharmacy. Thus, Ortho seeks to establish standing through assertion of an interest in the sale of RETIN–A for treatment of wrinkles and in the future sale of RENOVA.

In light of its interests from the off-label sales of RETIN–A, Ortho relies on two cases. In the first, Johnson & Johnson brought suit under the Lanham Act to enjoin the maker of NAIR depilatory from advertis-

ing that that product contained baby oil. *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980). The district court had denied plaintiff's motion for injunctive relief and subsequently dismissed the claim for injunctive relief. The district court recognized that while the plaintiff need not quantify its injury when seeking only injunctive relief in a Lanham Act suit, the plaintiff had failed to prove that its loss of sales was caused by the defendant's allegedly false advertising. The Second Circuit reversed, holding that the "correct standard is whether it is likely that Carter's advertising had caused or will cause a loss of Johnson sales ..." *Id.* at 190. This standard, however, "will not be presumed, but must be demonstrated." *Id.* The Second Circuit then reviewed the evidence and found that "though not overwhelming, [it] is sufficient to prove a likelihood of damage from loss of sales." *Id.* In particular, the court concluded that although the plaintiff and defendant did not compete in the depilatory market, they did compete in the broader hair removal market; that Johnson & Johnson's products were used as moisturizers after the use of depilatories; and that defendant's advertising campaign directly linked the depilation and moisturizing markets. The court also concluded that the causal connection between the defendant's advertising and the plaintiff's sales was established by specific evidence. Johnson & Johnson showed that a number of consumers used baby oil after depilation; that NAIR's share of the depilatory market had increased since the addition of baby oil to its product; that overall sales of baby oil had declined; and that a consumer witness testified at trial that she switched to NAIR

because it was advertised as containing baby oil. Johnson & Johnson also introduced surveys of consumers who indicated that after viewing the NAIR ads they thought they would not need to use baby oil if they used NAIR. *Id.* at 190–91.

Ortho has introduced little evidence in this case that could justify finding an injury or a causal connection to Cosprophar's conduct. In several of Cosprophar's advertisements, the alleged benefits and dangers of transretinoic acid are discussed, although there is no direct mention of RETIN–A. This might be sufficient to create a "link" between drug and cosmetic skin-care markets. However, the parties here do not "compete" in any market, because Ortho is barred by federal law from promoting RETIN–A for anti-wrinkle use. The only "interest" Ortho has is fortuitous because any commercial action taken to protect that interest would subject Ortho to the possibility of federal prosecution. Furthermore, all of the advertisements discussing transretinoic acid note that it is a prescription drug. There was no evidence that people seeking the medicinal benefits of transretinoic acid would eschew a prescription in favor of cosmetics, some of which would exceed the price of a prescription. Indeed, there was no evidence of what consumers thought regarding either product, other than testimony and newspaper articles reflecting the vast amount of publicity that RETIN–A received as a result of the JAMA article.[13] Furthermore, Ortho showed no damages whatsoever. At trial, Ortho's marketing witness testified that off-label sales of RETIN–A increased markedly between 1988 and the present. Tr. 416–17.[14]

13. The excluded surveys, discussed *supra* at pp. 1118–1122, would not help Ortho here. The surveys were offered only to corroborate testimony of the breadth of consumer awareness of the alleged benefits of RETIN–A. Even if the court were to accept the surveys and their contents for the purposes offered by the plaintiff, there is no indication that the surveys address alternative skin-care treatments, alternative products, or specifically, defendant's products. They thus fail in establishing a causal link to the defendant for any damage suffered by Ortho.

14. Mr. Altomari testified that by his estimate in terms of "factory sale," the price at which Ortho (and Johnson & Johnson) would sell a product to

wholesalers, RETIN–A sales for 1988 totalled "about $100,000,000." Tr. 417. Prior factory sales for RETIN–A were approximately $40,000,-000. *Id.* Projected sales for 1992 are "somewhere around $110,000,000," which by Mr. Altomari's estimate marked "a little bit of a decline in unit volume" that has been offset by normal price increases. *Id.* Such speculative and vague testimony is insufficient to establish damages. Similarly, Ortho did not introduce any evidence suggesting the reason for the "little bit of decline," if the decline had been established. Rather, plaintiff assumed that the decline was in part due to Cosprophar's advertisements. Such a conclusory allegation cannot be given credence by this court without more evidence.

Nor was any testimony introduced suggesting that consumers who might be dissatisfied with Cosprophar's products would subsequently reject pursuing a prescribed anti-wrinkle treatment with RETIN–A. While the holding of *Johnson & Johnson* instructs that a plaintiff does not need to allege specific damages, mere speculation that the plaintiff's profits might be greater but for the existence of the defendant will not suffice to create standing under the Lanham Act.

Ortho also relies upon *National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories,* 850 F.2d 904 (2d Cir.1988). In that case, defendant had the exclusive right under a federal statute to market its propranolol product for treatment of post-myocardial infarction ("post-MI"); however, generic propranolol could be prescribed for the same condition. Ayerst sent a letter to pharmacists dissuading them from dispensing generic propranolol when its own product, INDERAL, could be used, in part because INDERAL was the "only ... tablet[ ] indicated to reduce mortality post-MI." Plaintiffs, a trade association and a producer of generic propranolol, brought suit alleging antitrust and Lanham Act claims. The Second Circuit concluded that the plaintiffs had standing because their "alleged interest in benefiting from sales of generic propranolol is a legally protectable interest, even though [plaintiffs] ha[ve] no legal right to market their product for post-MI treatment." *Id.* at 914. The court indicated that the mere benefit that the plaintiffs could receive was sufficient to establish standing, so long as state and federal law did not prohibit the substitution of generic propranolol for post-MI indications. *Id.* at 912–914. The court also concluded that a causal connection had been shown,

because the plaintiffs alleged that the offending letter had dissuaded pharmacists from dispensing generic propranolol altogether, even for purposes other than post-MI treatment. *Id.* at 914.

Despite some similarities to the *Ayerst* case, this court is unpersuaded that that precedent carries the day. First, the scale of the market affected is questionable. The "anti-wrinkle" market seems too broad and ill-defined, encompassing a host of products aimed at the multitudinous signs of aging.[15] Second, like the plaintiffs in *Ayerst,* Ortho cannot promote its product in the marketplace, although it can receive benefits from being there. However, it is unclear that a drug is a "substitute" for a cosmetic. In *Ayerst,* two drugs with identical properties were in competition; here, a drug and a cosmetic are being compared. Third, Ortho is being kept out of the market by federal law, and yet seeks to shape the market by litigating against would-be competitors—ones against whom regular means of competitions are prohibited. This undercuts the FDA regulations designed to keep drug manufacturers from promoting unapproved secondary uses for their products. In *Ayerst,* the generic propranolol producers could not market their drug for post-MI use for a specified period of time because of a change in the regulatory scheme, designed to reward the manufacturer who had discovered a new use for its drug and received the required approval. Here, however, no such approval has been given in any form to a transretinoic acid product used for the treatment of wrinkles, and it may never be given. To allow Ortho to define the market in this way essentially clears out that market until its product has been approved or rejected by the FDA.[16]

---

**15.** From the various court papers, it is unclear whether the market at issue is the "anti-wrinkle" market, the "skin care" market, the "anti-age" market, if such a thing exists, or some other market. The court addresses what it believes to be the most limited of these markets.

**16.** Much ink has been spilled by both parties as to whether Ortho has engaged in illegal conduct with regard to RETIN–A's off-label use for wrinkle treatment. As is discussed above, federal statutes prohibit Ortho in its labelling and advertising from recommending new uses for a drug before such uses are approved by the FDA. *See*

21 U.S.C. §§ 321(m), 331(a), 331(*l*), and 352(a). In its regulations, the FDA has given a definition of labelling which includes most forms of tangible communication "containing drug information supplied by the manufacturer, packer, or distributer of the drug." 21 C.F.R. 202.1(*l*)(2) (1992). The extent to which the FDA limits unlabeled uses is defined by 21 C.F.R. § 312.7(a) (1992):

A sponsor or investigator, or any person acting on behalf of a sponsor or investigator, shall not represent in a promotional context that an investigational new drug is safe or effective for

Finally, Ortho again stumbles over the causation block. It introduced no evidence at trial that any consumer had not pursued a prescription for RETIN–A when confronted with Cosprophar's advertising. Such evidence is not merely evidence of confusion. Rather, it is evidence that consumers define the "anti-wrinkle" market as Ortho does. In other words, such evidence would establish that consumers see RETIN–A and a cosmetic available only in a pharmacy as being competitive, interchangeable, or one in any way a substitute for the other.

Ortho's final attempt at establishing standing is based on the future sales of RENOVA. Plaintiff relies heavily on a footnote in *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. 1209 (D.Del.1986). In that case, Upjohn held a patent covering the topical application of minoxidil compounds to stimulate hair growth. (Upjohn had previously held a patent for all uses of minoxidil, with specific disclosure for the treatment of hypertension—a use for which they received FDA approval.) Upjohn decided to pursue development of a product called REGAINE for its patent. At the time of litigation, the FDA had not yet approved the New Drug Application of REGAINE. Defendant Riahom Corp. marketed a hair "cosmetic" called RIVIXIL which contained a salt of minoxidil. At various hair care industry trade shows, Riahom promoted its product with booth displays, brochures, videotapes and the like, many of which made direct reference to Upjohn and the publicity about minoxidil. The district court concluded that no preliminary injunction would issue against the defendants for patent infringement because no direct evidence had been introduced that defendant's product actually promoted hair growth; however, the court granted the injunction under the Lanham Act based on deceptive advertising likely to confuse the public. After finding that "defendant's deceptive claims will deny Upjohn part of the legitimate market for its patented discovery," the court added in a footnote: "Upjohn still may obtain relief under the Lanham Act although REGAINE is not yet

the purposes for which it is under investigation or otherwise promote the drug. This provision is not intended to restrict the full exchange of scientific information concerning the drug, including dissemination of scientific findings in scientific or lay media. Rather, its intent is to restrict promotional claims of safety of effectiveness of the drug for a use for which it is under investigation and to preclude commercialization of the drug before it is approved for commercial distribution.

The publicity surrounding RETIN–A and the alleged benefits for wrinkle treatment are the subject of both FDA and Department of Justice investigations. Tr. 512. Ortho seeks refuge in the second sentence of 21 C.F.R. § 312.7(a), apparently claiming that any media exchanges were exempt from penalization. Cosprophar, on the other hand, asserts that (1) Ortho cannot establish standing because of its "illegal promotional campaign" of RETIN–A through a carefully orchestrated media blitz based on scientific research that it helped to sponsor and (2) that Ortho's conduct prevents injunctive relief under the doctrine of unclean hands. As to the latter charge, Ortho contends that Cosprophar is violating FDA regulations by claiming that its products have an effect on the structure or function of the body, thereby deeming the cosmetics as "drugs" under the FDA regulations. Thus, argues Ortho, a judgment in this case favorable to the plaintiff will have the salutary benefits of curing FDA violations that Cosprophar may be committing.

Private litigants do not have standing to charge violations of the branding provisions of the Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. § 337. *See American Home Prod. Corp. v. Johnson & Johnson*, 436 F.Supp. at 791. Furthermore, this court does not have before it a sufficiently developed record or adequate evidence to make any finding of violations of the FDCA or FDA regulations by either party. Those alleged infringements can be and may be pursued by the FDA in other actions. Only then can a fair adjudication of the merits of those allegations take place. Thus, the allegations, along with the defense of unclean hands need not be considered.

The court does note, however, that the *possibility* of FDCA violations or FDA regulations provides yet another reason for denying the plaintiff standing as a "competitor" in a market in which it may have illegally entered. Were the FDA successfully to prosecute Ortho for illegally promoting "off-label" uses of its products, any relief given to Ortho against Cosprophar under the Lanham Act would unfairly benefit the plaintiff and injure the defendant. The possibility that Cosprophar's conduct runs counter to protection of the consumer, a major concern of the Lanham Act, *see Wojnarowicz v. American Family Ass'n*, 745 F.Supp. 130, 141 (S.D.N.Y.1990); *Coca–Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 31 (6th Cir.1987), is insufficient justification for such a result. Under the facts of this case, the proper monitors of Cosprophar's behavior are the federal authorities and other private cosmetic manufacturers within the skin care market.

on the market (and may never be if it does not win FDA approval)." *Id.* at 1225 and n. 18.

This court is not persuaded to find that Ortho has standing based on this statement. The two cases that the *Upjohn* court relied upon concerned products that did not require federal regulatory approval before being disseminated into the marketplace. *See Paramount Pictures Corp. v. Worldwide Entertainment Corp.*, 195 U.S.P.Q. 539, 1977 WL 25613 (S.D.N.Y.1977) (standing established in suit over movie poster for motion picture which had not been released at time of unfair acts); *Matsushita Elec. Corp. v. Solar Sound Systems, Inc.*, 381 F.Supp. 64 (S.D.N.Y.1974) (photograph of plaintiff's product enjoined even though product in photo was not sold in United States).[17] Therefore, the product releases were only dependent upon the plaintiffs' marketing strategies; there was no threat or concern that the products could not be introduced into the marketplace whenever the plaintiffs wished. Ortho is in no such position and may never properly be in the "anti-wrinkle market" with either RETIN–A or RENOVA.

The *Upjohn* court also found as a matter of fact that the plaintiffs had shown a likelihood of success on the merits to warrant a preliminary injunction; the defendants had made false and misleading claims that induced consumers to purchase its product. On the basis of the record of this case, there is no credible evidence whatsoever that determines why consumers purchase either Ortho's or Cosprophar's products; all that this court has are speculations and assertions by counsel on both sides.

The two remaining cases on which Ortho relies are similarly unhelpful. In *Princeton Graphics Operating L.P. v. NEC Home Electronics, Inc.*, 732 F.Supp. 1258 (S.D.N.Y. 1990), the court found standing under the Lanham Act for a plaintiff who produced computer monitors compatible with the IBM PS/2 series, but did not have such a monitor available at the time of defendant's alleged impermissible conduct. The court found standing, but only after finding that the two parties were already competitors in the computer market "at the relevant time of this action." *Id.* at 1264. Without FDA approval of RENOVA, this court cannot say that as a result of the filing of a new drug application that Ortho is automatically a competitor with Cosprophar. In *Bloch v. Smithkline Beckman Corp.*, 1988 WL 117927, 1988 U.S.Dist. LEXIS 12397 (E.D.Pa.1988), the court found that a plaintiff had standing for a Lanham Act claim against his former employer for allegedly falsely advertising a prescription diuretic in a way that limited the market potential the plaintiff hoped to produce. In the court's limited discussion, it concluded that "plaintiff had a reasonable interest in being protected against false advertising, assuming plaintiff can prove he would have entered the market." *Id.* 1988 WL 117927 at p. *25, 1988 U.S.Dist. LEXIS 12397 at p. *70. There is little doubt that Ortho would enter the anti-wrinkle market if it could; but its ability to do so is circumscribed by a regulatory scheme which the plaintiff cannot evade by this litigation. The court therefore concludes that plaintiff does not have standing to pursue its Lanham Act claims.

## III. NEW YORK GENERAL BUSINESS LAW

■ Ortho also sought relief in its complaint pursuant to New York General Business Law, §§ 349, 350 (McKinney 1988). Section 349 prohibits "deceptive acts or practices in the conduct of any business" while section 350 similarly prohibits false advertising in the conduct of any business. The courts have established that "[t]he elements of a claim for deceptive practices under § 349, as well as the elements of a claim for

---

17. The *Upjohn* court also noted that:
[A] viable unfair competition claim can exist where the products do not compete directly because one is available over-the-counter and the other is available by prescription. *See, e.g., American Home Products Corp. v. Morton–Norwich Products, Inc.*, 202 U.S.P.Q. 824, 826 n. 2 [1978 WL 21535] (S.D.N.Y.1978) (possibility of confusion between similarly named prescription birth control pill and over-the-counter suppository contraceptive).
*Upjohn*, 641 F.Supp. at 1225 n. 18. In *American Home Products*, the plaintiff had FDA approval to market its product for contraceptive purposes, whereas Ortho's place in the market has not yet been approved.

deceptive advertising under § 350 are (i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured." *Coors Brewing Co. v. Anheuser–Busch Cos.,* 802 F.Supp. 965, 975 (S.D.N.Y. 1992). Whether an act or practice is misleading is "not to be determined by 'look[ing] to the average customer but the vast multitude which the statutes were enacted to safeguard—including the ignorant, the unthinking, and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions.'" *Id.* (quoting *McDonald v. North Shore Yacht Sales, Inc.,* 134 Misc.2d 910, 513 N.Y.S.2d 590, 593 (Sup.Ct.1987)) (alterations in the original). Ortho failed to introduce any evidence that established that consumers are misled by Cosprophar's advertising. Indeed, no evidence at all was introduced about what consumers—either the average consumer or the vast multitude—thought about Cosprophar's product. The court further notes that Ortho appears to have abandoned this claim, having failed to argue the claim in its post-trial memo or in its response papers once Cosprophar had addressed the issues in its own brief. The claims are therefore dismissed for failure to show that Cosprophar's advertisements mislead consumers.

## CONCLUSION

Because plaintiff did not establish standing to bring claims under § 43(a) of the Lanham Act, and did not introduce evidence showing that the defendant's advertisements are misleading in a material respect and therefore in violation of New York General Business Law §§ 349 and 350, this court orders all claims against the defendant in this action dismissed. Furthermore, in accordance with Federal Rule of Civil Procedure 58, the court orders the Clerk of the Court to prepare a final judgment in accordance with this opinion.

SO ORDERED.